Steve W. Berman (*pro hac vice* to be filed)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
Email: steve@hbsslaw.com

Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
Email: shanas@hbsslaw.com

Robert C. Hilliard (*pro hac vice* to be filed)
HILLIARD MARTINEZ GONZALES LLP
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
Tel: (361) 882-1612
Fax: (361) 882-3015
Email: bobh@hmglawfirm.com

*Attorneys for Plaintiffs*
[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARANDA DOWDY, DONALD MALONE, DUANE WOODSON, GILBERT LIRIANO, HARLAN ROBINSON, HOWARD WAIT, JASON BUTLER, JEROME SINGLETARY, JERRY JOHNSON, JEWEL BARROW, JOHN CAMERON SIM II, JOSH SULLIVAN, KIMBERLY POLLOCK, KRISTOFER VICE, LANNEY MOORE, LARRY SULLIVAN, LATANYA KILLINGWORTH, MATTHEW BILLY HUNTER, RICHARD BIVIANO, RONALD JOHNSON, SAMUEL ASHLEY JR., SARA GERALD, SHIRLEY HUDSON, TAMELA KEMP, and WILLIAM THOMAS,<br><br>Plaintiffs,<br><br>    v.<br><br>GILEAD SCIENCES, INC.,<br><br>Defendant. | No. _____<br><br>COMPLAINT FOR DAMAGES<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

Page

I.   NATURE OF THE ACTION ..................................................................... 1

II.  JURISDICTION AND VENUE ................................................................ 4

III. INTRADISTRICT ASSIGNMENT ......................................................... 4

IV.  PARTIES ................................................................................................ 5

V.   FACTUAL ALLEGATIONS ................................................................. 18

     A.   Background ................................................................................. 18

          1.   Laws and Regulations Governing the Approval and Labeling of
               Prescription Drugs ........................................................... 18

          2.   Tenofovir and Gilead's TDF- and TAF- Containing Drug Products
               Indicated for Use in Treating HIV ..................................... 21

     B.   Gilead Knew Before Viread Was Approved That TDF Posed a Significant
          Safety Risk ................................................................................ 26

     C.   Gilead's Knowledge of TDF Toxicity Grew As Patients' Kidneys and Bones
          Were Damaged By the TDF Drugs ............................................. 28

     D.   Before Gilead Developed Stribild, It Knew That Renal Adverse Events Were
          More Likely When Patients Took TDF As Part Of A Boosted Regimen ................. 33

     E.   Before Gilead Developed Each of the TDF Drugs, It Knew that TAF Was Less
          Toxic to Kidneys and Bones than TDF ....................................... 34

     F.   Gilead Withheld its Safer TAF Design to Protect its TDF Sales and Extend
          Profits on its HIV Franchise ....................................................... 40

     G.   Gilead Knowingly Designed its TDF Drugs To Be Unreasonably Dangerous
          and Unsafe to Patients' Kidneys and Bones ................................ 42

     H.   Gilead Obtained FDA Approval for its TAF-Based Products by Relying on
          Studies Demonstrating TAF's Superiority over TDF ................... 46

     I.   Gilead Markets TAF as Superior to TDF .................................... 48

     J.   Gilead Failed to Adequately Warn about the Risks of TDF ......... 52

          1.   Gilead Failed to Adequately Warn Doctors about the Risks of TDF ............. 52

          2.   Gilead Failed to Adequately Warn Patients about the Risks of TDF ............. 60

VI.  TOLLING OF THE STATUTE OF LIMITATIONS ............................... 62

VII. CLAIMS FOR RELIEF ......................................................................... 64

COUNT I STRICT PRODUCTS LIABILITY – DESIGN DEFECT  UNDER THE LAWS OF THE STATES OF ALABAMA, COLORADO, FLORIDA, GEORGIA, ILLINOIS, MARYLAND, MINNESOTA, NEW YORK, AND TENNESSEE ................... 64

COUNT II STRICT PRODUCTS LIABILITY – FAILURE TO WARN UNDER THE LAWS OF THE STATES OF ALABAMA, COLORADO, FLORIDA, GEORGIA, ILLINOIS, MARYLAND, MINNESOTA, NEW YORK, AND TENNESSEE ................... 66

COUNT III LOUISIANA PRODUCTS LIABILITY ACT, LA. R.S. §§ 9:2800.51 *ET SEQ.*........... 68

COUNT IV NEGLIGENCE AND GROSS NEGLIGENCE UNDER THE LAWS OF THE STATES OF ALABAMA, COLORADO, FLORIDA, GEORGIA, ILLINOIS, MARYLAND, MINNESOTA, NEW YORK, AND TENNESSEE ...................................... 69

COUNT V FRAUD BY OMISSION UNDER THE LAWS OF THE STATES OF ALABAMA, COLORADO, FLORIDA, GEORGIA, ILLINOIS, MARYLAND, MINNESOTA, NEW YORK, AND TENNESSEE ..................................................... 72

COUNT VI BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE LAWS OF THE STATES OF ALABAMA, COLORADO, ILLINOIS, MARYLAND, MINNESOTA, NEW YORK, AND TENNESSEE ...................................... 75

COUNT VII VIOLATION OF STATE CONSUMER PROTECTION LAWS .............................. 77

    a.    Alabama, Ala. Code §§ 8-19-1, *et seq.*....................................................... 79

    b.    Colorado, Colo. Rev. Stat. §§ 6-1-101 *et seq.*........................................... 79

    c.    Illinois, 815 ILCS 505/1 *et seq.* and 815 ILCS 510 *et seq.* ........................ 80

    d.    Maryland, Md. Com. Law Code Ann. § 13-101 *et seq.* ............................... 80

    e.    Minnesota, Minn. Stat. §§ 325F.68 *et seq.*, §§ 325D.44 *et seq.*................. 81

    f.    New York, N.Y. Gen. Bus. Law § 349........................................................ 81

PRAYER FOR RELIEF ...................................................................................................... 82

JURY DEMAND.................................................................................................................. 82

Plaintiffs bring this civil action for damages against Defendant Gilead Sciences, Inc. ("Gilead" or "Defendant"). Based on the investigation of counsel, Plaintiffs allege on information and belief as follows:

## I.     NATURE OF THE ACTION

1.     This action arises out of injuries Plaintiffs sustained as a result of ingesting the prescription drug Stribild, or Stribild and one or more of the prescription drugs Viread, Truvada, Atripla, and Complera, which are manufactured and marketed by Gilead for the treatment of Human Immunodeficiency Virus-1 ("HIV") infection.[1]

2.     Gilead designed each of the drugs to contain a form of the compound tenofovir that Gilead knew was toxic to patients' kidneys and bones. Tenofovir is a nucleotide analogue reverse transcriptase inhibitor ("NRTI"), one of the classes of antiretroviral drugs used to treat HIV. NRTIs work by blocking an enzyme HIV needs to replicate. Gilead did not discover tenofovir. Scientists in Europe discovered tenofovir in the 1980s, and though the anti-HIV properties of tenofovir were promising, it had a downside: it cannot not be administered effectively by mouth.

3.     Because an intravenous tenofovir formulation had little sales potential, Gilead developed a form of tenofovir, tenofovir disoproxil, which can be taken orally.[2] The fumaric acid salt of tenofovir disoproxil is tenofovir disoproxil fumarate ("TDF"). When a patient takes a pill containing TDF, the patient's body converts TDF into tenofovir. Although TDF can be taken by mouth, a high dose of 300 mg is typically required to achieve the desired therapeutic effect.

4.     Gilead designed TDF 300 mg to be an active ingredient in five drugs that are approved to treat HIV: Viread (TDF 300 mg tablets), approved October 26, 2001; Truvada (TDF 300 mg/emtricitabine 200 mg tablets), approved August 2, 2004; Atripla (TDF 300 mg/emtricitabine 200 mg/efavirenz 600 mg tablets), approved July 12, 2006; Complera (TDF 300 mg/emtricitabine 200

---

[1] Viread is also indicated to treat Hepatitis B. And Truvada is also indicated for use in combination with safe sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk.

[2] Tenofovir disoproxil is a prodrug form of tenofovir. Prodrugs are pharmacologically inactive compounds that can be more efficiently absorbed into the bloodstream and then converted into the active form of the drug within the body.

mg/rilpivirine 25 mg tablets), approved August 10, 2011; and Stribild (TDF 300 mg/emtricitabine 200 mg/elvitegravir 150 mg/cobicistat 150 mg tablets), approved August 27, 2012 (collectively, these are the "TDF Drugs").

5.      Before Gilead began selling its first TDF Drug, Viread, in 2001, Gilead knew that TDF posed a safety risk to patients' kidneys and bones. Gilead knew that two of its other antiviral drugs with structures similar to tenofovir, cidofovir and adefovir dipivoxil, had been highly nephrotoxic (i.e., toxic to kidneys) and that preclinical data for TDF showed that it could cause significant kidney and bone damage. Gilead also knew that the relatively high dose of TDF created a greater risk of toxic effects, and that bone and kidney toxicities were even more likely to be seen with long-term use of TDF for the treatment of a virus that, for the foreseeable future, has no cure.

6.      Gilead's knowledge of the toxic effects of TDF only grew as patients began treatment with and were injured by each successive TDF product. By the time Gilead designed Stribild, it had ten years' worth of cumulative evidence that TDF injured patients' kidneys and bones.

7.      Gilead also knew, before it obtained approval to market Viread and Gilead's subsequent TDF Drugs, that it had discovered a safer tenofovir prodrug, tenofovir alafenamide fumarate ("TAF"). TAF is absorbed into the cells HIV targets much more efficiently than TDF. As a result, TAF can be administered at a dramatically reduced dose compared to TDF, but still achieve the same or higher concentrations of active tenofovir in the target cells. Because TAF can be administered at a much lower dose than TDF, its use is associated with less toxicity and fewer side effects. A 25 mg dose of TAF achieves the same therapeutic effect as a 300 mg dose of TDF, with a better safety profile. Despite knowing that TAF could be given at a much lower, safer dose, Gilead designed Viread, Truvada, Atripla, Complera, and Stribild to contain TDF rather than safer TAF.

8.      Falsely claiming that TAF was not different enough from TDF, Gilead abruptly shelved its TAF design in 2004. However, as John Milligan, Gilead's President and Chief Executive Officer, later admitted to investment analysts, the real reason Gilead abandoned the TAF design was that TAF was *too different* from TDF. Once Gilead's first TDF product, Viread, was on the market, Gilead did not want to hurt TDF sales by admitting that its TDF-based products are unreasonably and unnecessarily unsafe.

COMPLAINT FOR DAMAGES – 2
Case No.:
010759-11 1090516 V6

9.      It was crucial at that time for Gilead to increase Viread sales, which comprised 53% of Gilead's total product sales in 2002, and 68% of Gilead's total product sales in 2003. Gilead was so desperate to expand Viread sales that it repeatedly misrepresented Viread's safety profile when promoting the drug to doctors—falsely calling it a "miracle drug" with "no toxicities."

10.     In addition, Gilead knew that by withholding the safer TAF design, it could extend the longevity of its HIV drug franchise and make billions two times over: first, with TDF medications until TDF patent expiration, which would begin by no later than 2018, and second, with TAF medications until TAF patent expiration as late as 2032. Only once Gilead realized billions in sales through most of the TDF patent life did it seek to market safer TAF-based versions of its HIV medications.

11.     Finally, in 2015, Gilead began selling the first of its TAF-designed medicines and convinced doctors to switch their patients from TDF-based to TAF-based regimens by demonstrating TAF's superior safety profile over TDF with respect to kidney and bone toxicity—the very benefits that Gilead could have and should have incorporated into its prior product designs but withheld from doctors and patients for over a decade.

12.     Gilead also made Stribild even more dangerous to Plaintiffs when it designed the drug to include cobicistat in combination with 300 mg TDF. Cobicistat is a pharmacoenhancer or "booster" that inhibits the breakdown of elvitegravir, another active ingredient in Stribild. Cobicistat allows elvitegravir to persist in the patient's system long enough to permit once-daily dosing.

13.     Gilead knew years before it developed Stribild that: (a) higher tenofovir concentrations in patients' blood, as opposed to the target cells, endangers the kidneys; (b) tenofovir concentrations in patients' blood increase significantly when patients take tenofovir with a booster; and (c) TDF-associated renal toxicity occurs more frequently in patients taking TDF as part of a boosted regimen.

14.     When Gilead developed its first TAF-based antiviral product, Genvoya—which is Stribild with TAF in place of TDF—Gilead reduced the dose of TAF from 25 mg to 10 mg to account for the fact that cobicistat significantly increases tenofovir concentrations. Gilead knew to reduce the dose of TAF in Genvoya before it submitted Stribild to the FDA for marketing approval.

1    Despite this knowledge, Gilead did not reduce the dose of TDF when it designed Stribild. Stribild is

2    even more toxic to patients' kidneys and bones than Gilead's other TDF-based products.

3        15.    In addition to withholding safer designs, Gilead failed to adequately warn physicians

4    and patients about the risks and safe use of TDF. Gilead provided only the weakest, inadequate

5    warnings to doctors and patients about the need for frequent monitoring of all patients for TDF-

6    associated kidney and bone damage—preventing doctors from detecting early signs of TDF toxicity.

7        16.    Gilead provides stronger monitoring warnings to physicians and patients in the

8    European Union than it does in the United States for the exact same TDF products. Contrary to its

9    U.S. labeling, Gilead has consistently recommended, since the approval of its first TDF Drug in the

10   EU, that doctors in the EU monitor all TDF Drug patients for multiple markers of TDF toxicity on a

11   frequent, specified schedule. There is no scientific or medical rationale for these differences. Gilead

12   was more concerned with increasing or maintaining crucial U.S. sales than it was in safeguarding

13   patients from the known risks of TDF.

14       17.    Gilead intentionally withheld a safer alternative design of TDF Drugs it knew to be

15   dangerously toxic to patients' kidneys and bones, while failing to adequately warn about the risks

16   and safer use of the defective drugs, solely to make more money. Accordingly, Plaintiffs bring this

17   action to recover damages for their personal injuries and seek punitive damages arising from

18   Gilead's willful and wanton conduct.

19                    **II.    JURISDICTION AND VENUE**

20       18.    Jurisdiction exists under 28 U.S.C. § 1332(a) because all Plaintiffs and Gilead are

21   citizens of different states and the matter in controversy exceeds the sum or value of $75,000,

22   exclusive of interests and costs.

23       19.    Venue is proper in this District under 28 U.S.C. §§ 1391(1)-(2). Defendant resides in

24   this District and a substantial part of the events and omissions giving rise to Plaintiffs' claims

25   occurred in this District.

26                    **III.    INTRADISTRICT ASSIGNMENT**

27       20.    Pursuant to Civil L.R. 3-2(c), this action shall be assigned to the San Francisco

28   Division or the Oakland Division because Gilead resides and has its principal place of business in

COMPLAINT FOR DAMAGES – 4
Case No.:
010759-11 1090516 V6

1    San Mateo County. This action is related to another action pending before Judge Jon S. Tigar in the

2    Northern District of California.

### IV.    PARTIES

4    21.    Plaintiffs are consumers who ingested Stribild or Stribild and one or more of Gilead's

5    other TDF Drugs.

6    22.    Plaintiffs suffered personal injuries caused by ingesting TDF.

7    23.    Plaintiff Charanda Dowdy is and was at all relevant times a citizen of the State of

8    Maryland and domiciled in Baltimore, Maryland. Plaintiff Charanda Dowdy purchased and ingested

9    the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla and

10   Stribild from 2013 to 2017. As a result of Gilead's wrongful conduct with respect to the defective

11   TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

12   the TDF Drugs caused Plaintiff to suffer damage to her kidneys, resulting in renal failure and

13   requiring dialysis. Plaintiff's renal failure and related kidney damage has caused Plaintiff extreme

14   pain and suffering as well as mental anguish. Plaintiff's condition is so painful that she can no longer

15   participate in activities she once enjoyed that require movement and physical exertion. In addition,

16   Plaintiff's activities and quality of life are diminished based on her anxiety associated with being

17   dependent on dialysis due to her condition, and therefore, Plaintiff refrains from engaging in many of

18   life's activities. Plaintiff Charanda Dowdy must undergo dialysis treatments for her kidneys due to

19   the injuries caused by Gilead's defective TDF Drugs and is in the process of trying to obtain a kidney

20   transplant. Plaintiff required and incurred and will continue to require and incur expenses in

21   connection with medical treatment as a result of these injuries, including dialysis. Plaintiff has

22   endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as

23   a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries

24   and damages to be proven at trial.

25   24.    Plaintiff Donald Malone is and was at all relevant times a citizen of the State of

26   Colorado and domiciled in Lone Tree, Colorado. Plaintiff Donald Malone purchased and ingested

27   the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2008 to 2014 and

28   Stribild from 2014 to 2018. As a result of Gilead's wrongful conduct with respect to the defective

TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related deterioration has caused Plaintiff extreme pain and suffering as well as multiple fractures in his back, knees and ankles. Plaintiff's condition is so painful that he requires bilateral fusion surgery followed by painful and expensive physical therapy. In addition, Plaintiff's activities and quality of life are diminished based on his physical inability to work since 2017, which has required him to file for bankruptcy protection and receive disability benefits. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

25.     Plaintiff Duane Woodson is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Duane Woodson purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related deterioration has caused Plaintiff extreme fatigue, pain and suffering in his shoulders, back, hips, legs, knees, ankles, and feet. Plaintiff's condition and fatigue is so severe and painful that he can no longer lift more than twenty-five (25) pounds without back pain, jog for exercise, or stand for long periods of time. In addition, Plaintiff has difficulty climbing his apartment stairs, walking his dog daily, taking out his trash, and performing other daily activities. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

26.     Plaintiff Gilbert Liriano is and was at all relevant times a citizen of the State of New York and domiciled in Jamaica Queens, New York. Plaintiff Gilbert Liriano purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone density loss and kidney issues, which resulted in diagnoses of osteoporosis and Stage 3 chronic kidney disease, respectively. Plaintiff's osteoporosis with related injury and chronic kidney disease have caused Plaintiff extreme pain and suffering in his back, arms, legs. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

27.     Plaintiff Harlan Robinson is and was at all relevant times a citizen of the State of Florida and domiciled in Miami, Florida. Plaintiff Harlan Robinson purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2004 to 2012 and Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone density loss and kidney dysfunction, which resulted in diagnoses of osteoporosis and elevated creatinine levels in his kidneys, respectively, at the age of forty-three. Plaintiff's osteoporosis with related deterioration and failing kidney functions have caused Plaintiff extreme pain and suffering as well as a fractured left hand, right leg and damaged kidneys. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

28.     Plaintiff Howard Wait is and was at all relevant times a citizen of the State of Illinois and domiciled in Chicago, Illinois. Plaintiff Howard Wait purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild beginning in 2012. As a result of

Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone density loss, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related deterioration has occurred in his back, spine and hips, which has caused Plaintiff severe and debilitating pain and suffering as well as a chipped hip bone. As a result of Plaintiff's injuries, his income has significantly reduced at the age of sixty. Plaintiff lost his career as a computer specialist because he is not physically able to sit down for long periods of time to work on a computer. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

29.     Plaintiff Jason Butler is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Jason Butler purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild from 2010 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys, which resulted in a diagnosis of Stage 4 chronic kidney disease and required dialysis treatment at the young age of thirty-six. Plaintiff's Stage 4 chronic kidney disease and related kidney damage has caused Plaintiff extreme pain and suffering as well as mental anguish. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed, including working, driving, traveling and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on fatigue and his limited ability to participate in certain activities due to his condition, and therefore, Plaintiff refrains from engaging in many of life's activities. Plaintiff Jason Butler must undergo dialysis treatments three times per week for four hours each time due to the injuries caused by Gilead's defective TDF Drugs. Plaintiff's injuries have also had a negative impact on his career as a restaurant manager in that his injuries have prevented him from continuing to work. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical

1    treatment as a result of these injuries, including dialysis. Plaintiff has endured and will continue to

2    endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has

3    suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven

4    at trial.

5         30.    Plaintiff Jerome Singletary is and was at all relevant times a citizen of the State of

6    Maryland and domiciled in Pikesville, Maryland. Plaintiff Jerome Singletary purchased and ingested

7    the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2009 to 2014 and

8    Stribild from 2014 to 2015. As a result of Gilead's wrongful conduct with respect to the defective

9    TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

10   the TDF Drugs caused damage to Plaintiff's kidneys, resulting in a diagnosis of Stage 3 chronic

11   kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in

12   connection with medical treatment as a result of these injuries. Plaintiff has endured and will

13   continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

14   injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

15   to be proven at trial.

16        31.    Plaintiff Jerry Johnson is and was at all relevant times a citizen of the State of

17   Tennessee and domiciled in Cordova, Tennessee. Plaintiff Jerry Johnson purchased and ingested the

18   following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2014. As a result of

19   Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

20   injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused damage to his

21   kidneys, which resulted in a diagnosis of chronic kidney disease at the young age of twenty-eight.

22   Plaintiff's chronic kidney disease and related kidney damage has caused Plaintiff extreme pain and

23   suffering as well as mental anguish and depression. Plaintiff's condition is so painful that he can no

24   longer participate in activities he once enjoyed, including exercising, bowling, skating, playing

25   instruments, visiting with family and friends and other activities that require movement and physical

26   exertion. In addition, Plaintiff's activities and quality of life are diminished based on his pain and

27   anxiety due to his condition, and therefore, Plaintiff refrains from engaging in many of life's

28   activities. Plaintiff Jerry Johnson must severely restrict his diet due to the injuries caused by Gilead's

COMPLAINT FOR DAMAGES – 9
Case No.:
010759-11 1090516 V6

1    defective TDF Drug. Plaintiff required and incurred and will continue to require and incur expenses

2    in connection with medical treatment as a result of these injuries. Plaintiff has endured and will

3    continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

4    injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

5    to be proven at trial.

6         32.    Plaintiff Jewel Barrow is and was at all relevant times a citizen of the State of New

7    York and domiciled in Poughkeepsie, New York. Plaintiff Jewel Barrow purchased and ingested the

8    following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla, Complera

9    and Stribild beginning in 2001. As a result of Gilead's wrongful conduct with respect to the defective

10   TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

11   the TDF Drugs caused Plaintiff to suffer kidney damage, which resulted in a diagnosis of Stage 3

12   Chronic Kidney Disease at the age of fifty-two. Plaintiff's chronic kidney disease and related kidney

13   failure has caused Plaintiff severe pain and suffering. Plaintiff's condition is so painful that she was

14   required to quit working and was declared disabled based on her kidney injuries. In addition,

15   Plaintiff's activities and quality of life are diminished based on her fears associated with the future

16   condition of her kidneys. Plaintiff required and incurred and will continue to require and incur

17   expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and

18   will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of

19   her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and

20   damages to be proven at trial.

21        33.    Plaintiff John Cameron Sim II is and was at all relevant times a citizen of the State of

22   Minnesota and domiciled in Minneapolis, Minnesota. Plaintiff John Cameron Sim II purchased and

23   ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from to 2012 to

24   2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff

25   ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused

26   Plaintiff to suffer bone demineralization and kidney dysfunction, which resulted in the diagnoses of

27   osteopenia and stage 3 chronic kidney disease, respectively. Plaintiff's osteopenia and related

28   injuries have occurred in his shoulders, and lower back, which have caused Plaintiff's extreme pain

COMPLAINT FOR DAMAGES – 10
Case No.:
010759-11 1090516 V6

and suffering. Plaintiff's inability to participate in most physical activities and loss of libido as a result of these injuries has severely impacted his quality of life. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

34.    Plaintiff Josh Sullivan is and was at all relevant times a citizen of the State of Georgia and domiciled in Augusta, Georgia. Plaintiff Josh Sullivan purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla, and Stribild beginning in 2007. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs resulted in kidney failure and a diagnosis of chronic kidney disease at the age of forty-two. Plaintiff's chronic kidney disease and related kidney failure has caused Plaintiff severe pain and suffering as well as five lengthy hospital stays. Plaintiff's condition is so severe and painful that he was required to quit working as a professional fork lift operator and was declared disabled based on his kidney injuries at the age of forty-two. In addition, Plaintiff's activities and quality of life are diminished based on fear of further deterioration of his kidneys, difficulty ambulating, and suffering diffuse pain. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

35.    Plaintiff Kimberly Pollock is and was at all relevant times a citizen of the State of Florida and domiciled in Miami, Florida. Plaintiff Kimberly Pollock purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff's bones to demineralize resulting in a diagnosis of osteoporosis in the lumbar spine. Plaintiff's osteoporosis and related injuries have occurred in her back and lumbar spine and have caused Plaintiff extreme pain

1   and suffering as well as use of a cane for ambulation. Plaintiff required and incurred and will

2   continue to require and incur expenses in connection with medical treatment as a result of these

3   injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

4   enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning

5   capacity, and other injuries and damages to be proven at trial.

6         36.     Plaintiff Kristofer Vice is and was at all relevant times a citizen of the State of

7   Louisiana and domiciled in Vinton, Louisiana. Plaintiff Kristofer Vice purchased and ingested the

8   following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild from

9   2005 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs,

10   Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF

11   Drugs caused Plaintiff to suffer damage to his kidneys and severe bone density loss, which resulted

12   in a diagnosis of renal failure, osteoporosis and osteopenia at the young age of thirty-six. Plaintiff's

13   renal failure, osteoporosis, osteopenia and related kidney damage has caused Plaintiff extreme pain

14   and suffering as well as a broken back and ribs. Plaintiff's condition is so painful that he can no

15   longer participate in activities he once enjoyed including playing baseball, volleyball, dancing or any

16   activity that requires movement and physical exertion. In addition, Plaintiff's activities and quality of

17   life are diminished based on his fear of breaking a bone or injuring himself due to his condition, and

18   therefore, Plaintiff refrains from engaging in many activities he previously enjoyed. Plaintiff

19   Kristofer Vice must have assistance to bathe due to the injuries caused by Gilead's defective TDF

20   Drugs, and has extreme difficulty standing for prolonged periods of time. Plaintiff required and

21   incurred and will continue to require and incur expenses in connection with medical treatment as a

22   result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental

23   anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and a loss

24   of earning capacity, and other injuries and damages to be proven at trial.

25         37.     Plaintiff Lanney Moore is and was at all relevant times a citizen of the State of

26   Alabama and domiciled in Huntsville, Alabama. Plaintiff Lanney Moore purchased and ingested the

27   following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild

28   beginning in 2005. As a result of Gilead's wrongful conduct with respect to the defective TDF

Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related deterioration has caused Plaintiff extreme pain and suffering as well as a fractured elbow, three fractured ribs and expensive physical therapy for bone strengthening. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

38.     Plaintiff Larry Sullivan is and was at all relevant times a citizen of the State of Louisiana and domiciled in Shreveport, Louisiana. Plaintiff Larry Sullivan purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2010 to 2011 and Stribild beginning in 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone density loss, which resulted in a diagnosis of osteopenia at the age of forty. Plaintiff's osteopenia has occurred in his thoracic vertebrae, ribs and spine and has caused Plaintiff extreme pain and suffering as well as multiple vertebrae and rib fractures. Plaintiff's injuries, pain and suffering have required him to quit working and to live on disability benefits at the age of forty-five. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

39.     Plaintiff LaTanya Killingworth is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff LaTanya Killingworth purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2008 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF

Drugs caused damages to Plaintiff's kidneys, resulting in a diagnosis of chronic kidney disease at the young age of forty-two. Plaintiff's chronic kidney disease has required Plaintiff to drastically alter her diet. Plaintiff's condition has resulted in her no longer being able to participate in many activities she once enjoyed, including visiting with family and friends and other activities that would require her to bring her own food and drink. In addition, Plaintiff's activities and quality of life are diminished due to pain and because Plaintiff can only take Tylenol for pain. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

40.     Plaintiff Matthew Billy Hunter is and was at all relevant times a citizen of the State of Alabama and domiciled in Fort Payne, Alabama. Plaintiff Matthew Billy Hunter purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild from 2004 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related deterioration has caused Plaintiff extreme pain and suffering as well as a fracture in his neck and right arm. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed, including water skiing, wakeboarding, parasailing, bike riding, auto repairs and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his inability to use his right arm for any type of lifting due to his condition, and therefore, Plaintiff refrains from engaging in many of life's activities. Plaintiff Matthew Billy Hunter must use only his left arm for any type of physical activity due to the injuries caused by Gilead's defective TDF Drugs, and has extreme difficulty sleeping. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of

1    his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and

2    damages to be proven at trial.

3          41.    Plaintiff Richard Biviano is and was at all relevant times a citizen of the State of

4    Florida and domiciled in Fort Lauderdale, Florida. Plaintiff Richard Biviano purchased and ingested

5    the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild beginning in

6    2007. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff

7    ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused

8    Plaintiff to suffer kidney dysfunction, which resulted in a diagnosis of hypercreatinemia. Plaintiff's

9    renal injuries resulted in lost time and wages. Plaintiff required and incurred and will continue to

10   require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff

11   has endured and will continue to endure suffering, mental anguish, and loss of enjoyment of life as a

12   result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries

13   and damages to be proven at trial.

14         42.    Plaintiff Ronald Johnson is and was at all relevant times a citizen of the State of New

15   York and domiciled in Earlton, New York. Plaintiff Ronald Johnson purchased and ingested the

16   following TDF Drugs for an FDA-approved use of the drugs: Atripla from to 2006 to 2014 and

17   Stribild from 2014 to 2015. As a result of Gilead's wrongful conduct with respect to the defective

18   TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

19   the TDF Drugs caused Plaintiff to suffer damages to his kidneys, which resulted in a diagnosis of

20   kidney failure at the young age of forty-seven. Plaintiff's kidney failure and related kidney damage

21   has caused Plaintiff extreme pain and suffering as well as constant fatigue and mental anguish.

22   Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed

23   including snowboarding, riding dirt bikes and any other activity that requires significant movement

24   and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on

25   concern about the future condition of his kidneys due to his condition, and therefore, Plaintiff

26   refrains from engaging in many of life's activities. Plaintiff required and incurred and will continue

27   to require and incur expenses in connection with medical treatment as a result of these injuries.

28   Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

1    enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

2    capacity, and other injuries and damages to be proven at trial.

3            43.     Plaintiff Samuel Ashley Jr. is and was at all relevant times a citizen of the State of

4    Louisiana and domiciled in LaPlace, Louisiana. Plaintiff Samuel Ashley Jr. purchased and ingested

5    the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada and Stribild

6    beginning in 2001. As a result of Gilead's wrongful conduct with respect to the defective TDF

7    Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

8    TDF Drugs caused Plaintiff's bones to demineralize, which resulted in a diagnosis of osteoporosis.

9    Plaintiff required and incurred and will continue to require and incur expenses in connection with

10   medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

11   suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

12   earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

13           44.     Plaintiff Sara Gerald is and was at all relevant times a citizen of the State of Florida

14   and domiciled in Pembroke, Florida. Plaintiff Sara Gerald purchased and ingested the following TDF

15   Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2007 to 2015. As a result of

16   Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was

17   injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer

18   bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and

19   related injuries have occurred in her arms, legs, and ankles, which has caused Plaintiff severe and

20   debilitating pain and suffering as well as a fractured right ankle. Plaintiff required and incurred and

21   will continue to require and incur expenses in connection with medical treatment as a result of these

22   injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

23   enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning

24   capacity, and other injuries and damages to be proven at trial.

25           45.     Plaintiff Shirley Hudson is and was at all relevant times a citizen of the State of

26   Georgia and domiciled in Atlanta, Georgia. Plaintiff Shirley Hudson purchased and ingested the

27   following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild beginning in

28   2005. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff

COMPLAINT FOR DAMAGES – 16
Case No.:
010759-11 1090516 V6

1   ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused

2   Plaintiff to suffer bone density loss, which resulted in a diagnosis of osteoporosis. Plaintiff's

3   osteoporosis and related injuries have caused Plaintiff extreme pain and suffering in her arms, legs,

4   knees and feet. Plaintiff's condition is so severe and painful that she has difficulty walking, she

5   cannot physically drive her vehicle, nor perform other activities that require movement and physical

6   exertion. Plaintiff required and incurred and will continue to require and incur expenses in

7   connection with medical treatment as a result of these injuries. Plaintiff has endured and will

8   continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her

9   injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

10  to be proven at trial.

11          46.     Plaintiff Tamela Kemp is and was at all relevant times a citizen of the State of

12  Georgia and domiciled in Atlanta, Georgia. Plaintiff Tamela Kemp purchased and ingested the

13  following TDF Drugs for an FDA-approved use of the drugs: Atripla, Stribild and Viread beginning

14  in 2011. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff

15  ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused

16  Plaintiff to suffer weakening of the bones, which resulted in a diagnosis of osteoporosis. Plaintiff's

17  osteoporosis and related injuries have occurred in her back, arms, hands, legs and feet, which has

18  caused Plaintiff severe and debilitating pain and suffering as well as a fractured tibia (shin bone) at

19  the age of forty-two. Plaintiff is no longer physically able to work and is required to rely on disability

20  benefits due to her bone injuries at the age of forty-three. Plaintiff required and incurred and will

21  continue to require and incur expenses in connection with medical treatment as a result of these

22  injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

23  enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning

24  capacity, and other injuries and damages to be proven at trial.

25          47.     Plaintiff William Thomas is and was at all relevant times a citizen of the State of

26  Maryland and domiciled in Baltimore, Maryland. Plaintiff William Thomas purchased and ingested

27  the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild from

28  2008 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs,

Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone density loss, which resulted in a diagnosis of osteoporosis at the young age of thirty-seven. Plaintiff's osteoporosis and related injuries have occurred in his knee and right foot which have caused Plaintiff extreme pain and suffering as well as fractures in his knee and right foot. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

48.     Defendant Gilead Sciences, Inc. is a Delaware corporation with its principle place of business at 333 Lakeside Drive, Foster City, California. Gilead is a biopharmaceutical company that develops, manufactures, markets, and sells prescription medicine, including but not limited to Viread, Truvada, Atripla, Complera, Stribild, Genvoya, Odefsey, and Descovy. Gilead reported revenue of $26.1 billion dollars in 2017 and has operations worldwide.

## V.     FACTUAL ALLEGATIONS

49.     Gilead's "Company Overview" states: "With each new discovery and investigational new drug candidate, we seek to improve the care of patients living with life-threatening diseases around the world."[3] It would more accurately state: We seek to improve the care of patients living with life-threatening diseases *only if and when it suits the company's financial needs*.

**A.     Background.**

**1.     Laws and Regulations Governing the Approval and Labeling of Prescription Drugs.**

50.     The Federal Food, Drug, and Cosmetic Act ("FDCA" or the "Act") requires manufacturers that develop a new drug product to file a New Drug Application ("NDA") in order to obtain approval from the Food and Drug Administration ("FDA") before selling the drug in interstate commerce. 21 U.S.C. § 355.

---

[3] *See, e.g.*, Gilead Sciences Company Overview, available at http://www.gilead.com/~/media/ Files/pdfs/other/US%20Corporate%20Overview%20%20111014.pdf.

51.     The NDA must include, among other things, data regarding the safety and effectiveness of the drug, information on any patents that purportedly cover the drug or a method of using the drug, and the labeling proposed to be used for the drug. 21 U.S.C. § 355(b).

52.     Manufacturers with an approved NDA must review all adverse drug experience information obtained by or otherwise received by them from any source, including but not limited to postmarketing experience, reports in the scientific literature, and unpublished scientific papers. 21 C.F.R. § 314.80(b).

53.     After FDA approval, manufacturers may only promote drugs in a manner consistent with the contents of the drug's FDA-approved label. 21 C.F.R. § 202.1. The FDA's Division of Drug Marketing, Advertising, and Communications monitors manufacturers' promotional activities and enforces the FDCA and its implementing regulations to ensure compliance.

54.     Under what is known as the Changes Being Effected ("CBE") regulation, a manufacturer with an approved NDA can make certain changes to its label without prior FDA approval by simply sending the FDA a "supplemental submission." 21 C.F.R. § 314.70(c)(6)(iii).

55.     Changes to the labeling a manufacturer can make pursuant to CBE without prior FDA approval include those to "add or strengthen a contraindication, warning, precaution, or adverse reactions for which the evidence of causal association satisfies the standard for inclusion in the labeling under § 201.57(c) of this chapter" and "to add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product." 21 C.F.R. § 314.70(c)(6)(iii)(A) and (C).

56.     A manufacturer must revise its label "to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitively established." 21 C.F.R. § 201.57(c)(6).

57.     The warnings section of the label "must identify any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions. If appropriate, information must be provided on such factors as the range of normal and abnormal values expected in the particular situation and the recommended frequency with which tests should be performed before, during, and after therapy." *Id*. at § 201.57(c)(6)(iii). According to an FDA Guidance for

Industry on the warnings and precautions section of the labeling, "[i]nformation about the frequency of testing and expected ranges of normal and abnormal values should also be provided if available."[4]

58.     Adverse reactions must be added to the label where there "is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." *Id*. at § 201.57(c)(7).

59.     A 2008 amendment to these regulations provides that a CBE supplement to amend the labeling for an approved product must reflect "newly acquired information." 73 Fed. Reg. 49609. "Newly acquired information" is not limited to new data but also includes "new analysis of previously submitted data." "[I]f a sponsor submits adverse event information to FDA, and then later conducts a new analysis of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA, the sponsor meets the requirement for 'newly acquired information.'" *Id*. at 49607.

60.     Under the 1984 Hatch-Waxman Amendments to the Act, Congress sought to expedite the entry of less expensive generic versions of brand name drugs by simplifying the generic approval process. A generic manufacturer seeking to sell a generic version of a brand name drug may file an Abbreviated New Drug Application ("ANDA"), which relies on the brand manufacturer's safety and efficacy data. The ANDA filer must demonstrate that its proposed generic product is therapeutically equivalent to the brand name drug, meaning that it: (a) contains the same active ingredient(s), dosage form, route of administration, and strength as the brand name drug; and (b) is bioequivalent to the brand drug (i.e., the drugs exhibit the same rate and extent of absorption).

61.     As a counter-balance to the abbreviated process for the approval of generic drugs, Hatch-Waxman may grant brand manufacturers a period of market exclusivity upon approval of the NDA. For example, Hatch-Waxman grants a five-year period of exclusivity (regardless of any patent protection) to products containing chemical entities not previously approved by the FDA. Under this five-year exclusivity, the FDA cannot even accept an ANDA to make a generic version of the drug

---

[4] https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM075096.pdf.

for four or five years from NDA approval (depending upon whether the generic asserted that the brand's patents were invalid or not infringed).

62.     Hatch-Waxman also streamlined the process for brand manufacturers to attempt to enforce their patents against potential infringement by generic manufacturers. If an ANDA contains a certification that the patents the brand has listed in its NDA are invalid or will not be infringed by the ANDA generic product (a "Paragraph IV certification"), the brand manufacturer can automatically delay FDA approval of the generic drug by suing the generic manufacturer for patent infringement. If the brand manufacturer brings a patent infringement action against the generic filer within 45 days of receiving notification of the Paragraph IV certification, the FDA may not grant final approval to the ANDA until the earlier of (a) the passage of two and a half years, or (b) the issuance of a court decision that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. §355(j)(5)(B)(iii).

63.     Generic drugs that are therapeutically equivalent to the brand name drug may be automatically substituted for the brand at the pharmacy counter. Due to state automatic substitution laws that permit or require generic substitution, once a generic version of a brand-name drug enters the market, the generic quickly captures the vast majority of the brand's sales, often obtaining 80% or more of unit sales within the first six months. On average, generics capture 90% of brand unit sales within the first year of generic entry.

**2.      Tenofovir and Gilead's TDF- and TAF- Containing Drug Products Indicated for Use in Treating HIV.**

64.     Tenofovir (chemical name, 9-(2-Phosphonomethoxypropyl)adenine ("PMPA")) is a type of medicine called a nucleotide analog reverse transcriptase and HBV polymerase inhibitor ("NRTI").

65.     In order for HIV to infect a healthy human cell, the virus must convert its ribonucleic acid ("RNA") based genome into a strand of complementary deoxyribonucleic acid ("DNA"). This process of converting the virus's RNA into DNA is reverse transcription, and is performed by an enzyme named reverse transcriptase. Reverse transcription occurs inside the human cell that the virus is infecting.

66.     NRTIs prevent the reverse transcriptase from converting its RNA into DNA, preventing the infection of the cell and spread of HIV. In order for NRTIs to stop HIV from infecting a cell, the drug must be absorbed into the cell and "activated" by the cell's biological machinery. The "activated" form of tenofovir is known as tenofovir-diphosphate ("TFV-DP").

67.     When used to treat HIV infection, tenofovir must be administered in combination with other anti-HIV drugs, a practice known as "combination antiretroviral therapy" or "cART." By using a combination of different classes of medications, physicians can customize treatment based on factors including how much virus is in the patient's blood, the particular strain of the virus, and disease symptoms. The aim of cART is to reduce the viral load, i.e., the amount of virus per unit of blood or plasma, of patients to levels where commercial viral load tests cannot detect the presence of the virus (generally a concentration of lower than 50 HIV-1 RNA copies per mL of plasma). A cART treatment regimen can incorporate multiple standalone pills or a single pill coformulated with all drugs necessary for the regimen.

68.     Gilead did not discover tenofovir. Tenofovir was discovered in the mid-1980s by the collaborative research efforts of scientists in Prague and Belguim. Although the anti-HIV properties of tenofovir were promising, it had a significant downside. When tenofovir is administered by mouth, very little of it is absorbed into the body.

69.     Because an intravenous formulation had little sales potential, Gilead developed a prodrug form of tenofovir that can be taken orally. Prodrugs are pharmacologically inactive compounds that can be more efficiently absorbed into the bloodstream and then converted into the active form of the drug within the body.

70.     One prodrug of tenofovir is tenofovir disoproxil (chemical name, bis(isopropyloxycarbonyloxymethyl)-PMPA or bis-POC PMPA). The fumaric salt of tenofovir disoproxil is tenofovir disoproxil fumarate, commonly known as TDF.

71.     While TDF is able to be taken by mouth, the proportion of tenofovir that enters the cells is relatively low. In order to have the desired therapeutic effect, a high dose of TDF must be administered. The standard dose of TDF for HIV treatment and prevention in adults is relatively large – 300 mg, taken once a day. A general principle of toxicology is that the "dose makes the

1   poison," i.e., larger doses are generally associated with higher rates of toxicity and adverse events.

2   Tenovofir is no different.

3       72.     Gilead has received FDA approval for five TDF-based drugs for the treatment of HIV.

4       73.     On October 26, 2001, the FDA approved Gilead's NDA 21356 for Viread (300 mg

5   TDF) tablets for use in combination with other antiretroviral agents for the treatment of HIV-1

6   infection. Gilead submitted limited clinical data supporting approval of the drug. Gilead had not

7   completed Phase III clinical studies. Gilead excluded from its clinical trials people who had serious

8   preexisting kidney dysfunction. And Gilead only studied Viread in treatment-experienced patients

9   (those who had previously been treated for HIV). In 2008, the FDA approved an additional Viread

10  indication for the treatment of Chronic Hepatitis B.

11      74.     On August 2, 2004, the FDA approved Gilead's NDA 21752 for Truvada tablets,

12  which is a combination product containing 300 mg TDF (i.e., Viread) and 200 mg emtricitabine, for

13  use in combination with other antiretroviral agents for the treatment of HIV-1 infection in adults.

14  Neither of the active ingredients in Truvada was new. The FDA approved the Truvada application

15  based primarily on data showing the fixed-dose combination drug was bioequivalent to its separate

16  components. On July 16, 2012, the FDA approved an additional indication for the use of Truvada in

17  combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of

18  sexually acquired HIV-1 in adults at high risk.

19      75.     On July 12, 2006, the FDA approved Gilead's NDA 21937 for Atripla tablets, which

20  is a combination product containing 300 mg TDF, 200 mg emtricitabine, and 600 mg efavirenz, for

21  use alone as a complete regimen or in combination with other retroviral agents for the treatment of

22  HIV-1 infection in adults. Gilead submitted no clinical data in support of NDA 21937. None of the

23  active ingredients in Atripla were new. Approval was based on a demonstration of bioequivalence

24  between the individual components and the fixed-dose combination.

25      76.     On August 10, 2011, the FDA approved Gilead's NDA 202123 for Complera tablets,

26  which is a fixed dose combination product containing 300 mg TDF, 200 mg emtricitabine, and 25

27  mg rilpivirine, for use as a complete regimen for the treatment of HIV-1 infection in treatment-naïve

28  adults (i.e., adults who had not been previously treated for HIV). None of the active ingredients in

Complera were new. Gilead submitted no new clinical safety or efficacy trials in connection with NDA 20123. Approval was based on the results of bioequivalence studies comparing the combination product to the individual component drugs.

77.     On August 27, 2012, the FDA approved Gilead's NDA 203100 for Stribild, which is a fixed dose combination product containing 300 mg TDF, 200 mg emtricitabine, 150 mg elvitegravir, and 150 mg cobicistat, for use as a complete regimen for the treatment of HIV-1 infection in treatment-naïve adults. Although elvitegravir and cobicistat had not been previously approved by the FDA, the FDA gave Gilead's Stribild NDA a 10-month standard review because there were already multiple regimens available for treatment naïve patients including one pill, once-a-day regimens.

78.     Before the FDA approved Viread in 2001, Gilead had discovered another prodrug version of tenofovir, which it originally called GS-7340 and which is now known as tenofovir alafenamide ("TAF"). TDF and TAF are two prodrug versions of the same parent drug, tenofovir, though TAF requires a dose more than ten times smaller than TDF to achieve the same therapeutic effect.

79.     TAF differs from TDF in its penetration into target cells. Unlike TDF, which is converted into the parent drug tenofovir in the gastrointestinal tract, liver, and blood, TAF is not converted into tenofovir until it has been absorbed by the cell. This allows TAF to be more efficiently absorbed by "target cells"—i.e., cells that HIV infects or "targets"—compared to TDF. This more efficient absorption allows TAF to achieve far greater intracellular concentrations of the activated drug (tenofovir-diphosphate) in target cells than even a dramatically larger dose of TDF. This enhanced efficiency in absorption leads to plasma concentrations of tenofovir that are 90% lower than TDF, while still maintaining intracellular concentrations of activated drug in target cells that is the same or higher than TDF. The lowered plasma concentrations of tenofovir found with TAF result in reduced toxicity compared to TDF, making TAF safer to use than TDF.

80.     On November 5, 2015, the FDA approved Gilead's first TAF-based design—NDA 207561 for Genvoya tablets, a fixed dose combination product which contains 10 mg TAF, 200 mg emtricitabine, 150 mg elvitegravir, and 150 mg cobicistat. Genvoya is indicated for the treatment of HIV-1 infection in adults and pediatric patients 12 years of age or older who have no antiretroviral

treatment history or to replace the current antiretroviral regimen in those who are virologically suppressed (HIV-1 RNA less than 50 copies per mL) on a stable antiretroviral regimen for at least 6 months with no history of treatment failure and no known substitutions associated with resistance to the individual components of Genvoya. The TDF-based counterpart to Genvoya is Stribild. Genvoya is identical to Stribild except for the substitution of TAF for TDF.

81.     On March 1, 2016, the FDA approved Gilead's NDA 208351 for Odefsey tablets, which is a combination product containing 25 mg TAF, 200 mg emtricitabine, and 25 mg rilpivirine, for use as a complete regimen for the treatment of HIV-1 infection in patients 12 years of age and older as initial therapy in those with no antiretroviral treatment history with HIV-1 RNA less than or equal to 100,000 copies per mL; or to replace a stable antiretroviral regimen in those who are virologically-suppressed (HIV-1 RNA less than 50 copies per mL of blood or plasma) for at least six months with no history of treatment failure and no known substitutions associated with resistance to the individual components of Odefsey. The TDF-based counterpart to Odefsey is Complera. Odefsey is identical to Complera except for the substitution of TAF for TDF.

82.     On April 4, 2016, the FDA approved Gilead's NDA 208215 for Descovy tablets, which is a fixed dose combination product containing 25 mg TAF and 200 mg emtricitabine, for use in combination with other antiretroviral agents, for treatment of HIV-1 infection in adults and pediatric patients 12 years of age or older. The TDF-based counterpart to Descovy is Truvada. Descovy is identical to Truvada except for the substitution of TAF for TDF.

83.     Upon information and belief, Gilead has not sought FDA approval of a standalone TAF drug product for the treatment of HIV. Viread, therefore, has no TAF-based counterpart for the treatment of HIV infection. Although the FDA approved Gilead's NDA 208464 for Vemlidy (300 mg TAF) tablets on November 10, 2016, Gilead only sought approval to market Vemlidy for the treatment of Hepatitis B infection in adults with compensated liver disease and thus cannot be marketed for the treatment of HIV.

**B.      Gilead Knew Before Viread Was Approved That TDF Posed a Significant Safety Risk.**

84.     Before Gilead's first TDF product, Viread, received FDA approval in 2001, Gilead knew that two of its other antiviral drugs that are structurally similar to tenofovir caused significant kidney damage.

85.     Tenofovir is a member of a class of molecules known as "acyclic nucleoside phosphonates." Two of Gilead's other antiviral drugs—cidofovir and adefovir[5]—are also acyclic nucleoside phosphonates.

86.     Cidofovir injection, marketed as Vistide, was Gilead's first commercial product. When the FDA approved Vistide in 1996, it carried a black box warning stating that renal impairment is the drug's major toxicity and renal failure resulting in dialysis or contributing to death have occurred with as few as one or two doses of Vistide.

87.     In December 1999, Gilead abandoned development of NRTI prodrug adefovir dipivoxil for the treatment of HIV after it proved so toxic to patients' kidneys in the later stages of Phase III clinical trials. In Gilead's clinical trial GS-408, 59% of patients demonstrated severe kidney toxicity after 72 weeks. One patient in the trial died due to multiorgan failure subsequent to kidney failure. Based on this experience, Gilead knew that adefovir dipivoxil was associated with delayed nephrotoxicity—meaning that its toxic effects might not be felt for some time after continued use. Gilead would later develop and market adefovir dipivoxil as Hepsera for treatment of hepatitis B virus infection. Critically, Gilead recognized that if it reduced the dose of adefovir dipivoxil from 120 mg—as used in trial GS-408 for the treatment of HIV—to 10 mg (the dose in Hepsera), an effective dose for hepatitis B virus treatment, the risk of nephrotoxicity is dramatically reduced.

88.     Tenofovir has a nearly identical structure to adefovir, varying only by the presence of a methyl group (i.e., a carbon atom bound to three hydrogen atoms) in tenofovir, which replaces a hydrogen atom in adefovir. As Gilead recognized in its 10-K for the year ending December 31, 2000,

---

[5] Like tenofovir, only a prodrug of adefovir—adefovir dipivoxil—can be effectively administered orally.

1    due to its experiences with nephrotoxicity in Phase III clinical trials of adefovir dipovoxil, delayed

2    toxicity issues similar to those experienced with adefovir dipivoxil could arise with TDF.

3           89.     Gilead also knew that while prodrugs allow the drug to be efficiently absorbed into

4    the bloodstream and then converted into an active form within the body, the conversion of the TDF

5    prodrug into free tenofovir outside the cell, and the presence of high levels of free tenofovir in the

6    blood, endangers the kidneys.

7           90.     The primary purpose of the kidney is to filter out toxins and waste products from the

8    blood, as well as help maintain the delicate balance of water, salts and other compounds in a person's

9    blood. The functional unit of the kidney is the nephron, a microscopic structure that consists of two

10   primary components: a renal "corsipucle" and a renal "tubule." On average, each kidney contains

11   hundreds of thousands to millions of nephrons.

12          91.     The renal corsipucle is the component of the nephron that directly filters the blood.

13   Blood flows through a network of capillaries (small blood vessels) known as the glomerulus. The

14   walls of these capillaries work as a filter, allowing certain compounds, as well as water, to pass

15   through. The fluid that is filtered through the capillary walls in the glomerulus, known as the filtrate,

16   is collected by a structure known as Bowman's capsule. One of the primary ways kidney function is

17   measured is by the rate of blood that is filtered by the glomeruli. This is known as the glomerular

18   filtration rate or "GFR."

19          92.     In Bowman's capsule, the filtrate is collected and drains into the other primary

20   component of the nephron, the tubule. Glomerular filtration is highly effective at removing many

21   toxins, but it also filters out many compounds, like water and electrolytes, that a person needs. In the

22   tubule, the cells lining the tubule put these crucial, non-toxic compounds back into the blood, as well

23   as filter out remaining toxins that glomerular filtration did not remove. After the filtrate exits the

24   tubule, it drains into the bladder. This processed filtrate is urine.

25          93.     This system of filtering the blood is extremely important and delicate. TDF primarily

26   damages the nephron tubule, due to hyper-concentration of free tenofovir within the tubule cells of

27   the nephron, which results in cell death or dysfunction. If the tubule cells are dysfunctional or dead,

28   they are unable or less able to perform the vital function of filtering waste and/or toxins and

reabsorbing beneficial compounds. Moreover, because tenofovir is renally eliminated, patients are exposed to an increased concentration of tenofovir as the kidneys become damaged.

94.     Since scientists first synthesized TDF, studies have consistently shown that it could cause significant kidney and bone damage. For example, an animal study published in 1999 showed that high doses of tenofovir were associated with significant bone toxicity in both simian immunodeficiency virus (SIV, the non-human primate version of HIV) infected and uninfected rhesus macaques, with a quarter of the treated animals experiencing significant bone toxicity.

95.     Gilead's preclinical studies of TDF showed that it could be toxic to kidneys and bones. Preclinical animal studies of TDF showed evidence of renal toxicity and that TDF exposure caused bone toxicity in the form of softening of the bones (osteomalacia) and reduced bone mineral density. Nephrotoxicity in animal models was related to dose as well as to duration of therapy.

96.     Gilead also knew that the relatively high dose of TDF needed to achieve the desired therapeutic effect created a greater risk of toxic effects, and that bone and kidney toxicities were even more likely with the long-term use of TDF which was needed to combat a disease with no known cure.

**C.     Gilead's Knowledge of TDF Toxicity Grew As Patients' Kidneys and Bones Were Damaged By the TDF Drugs.**

97.     As soon as Gilead began marketing Viread, patients started experiencing the nephrotoxic effects of TDF.

98.     In November 2001, less than one month after Viread entered the market, the first published case of TDF-associated acute renal failure occurred. Thereafter, additional reports of TDF-associated kidney damage, including but not limited to Fanconi syndrome, renal failure, renal tubular dysfunction, and nephrogenic diabetes insipidus, began to appear in the medical literature. Many of those adverse events occurred in patients without preexisting kidney dysfunction.

99.     Gilead was also seeing renal adverse events in its postmarketing safety data. In fact, the most common serious adverse events reported to Gilead were renal events, including renal failure,[6] Fanconi syndrome,[7] and serum creatinine increase.[8]

100.     In the first two years Viread was on the market, 40% of Viread adverse events reports received by Gilead were related to the renal/urinary system. This included 49 cases of increased creatinine, 16 cases of hypophosphatemia,[9] 42 cases of renal insufficiency, 51 cases of acute renal failure, 6 cases of chronic renal failure, and 32 cases of Fanconi syndrome. These numbers are far less than the true incidence of kidney damage experienced by Viread patients during this timeframe because postmarketing adverse events are underreported.

101.     Gilead had to update its Viread labeling at least four times to describe the kidney damage patients experienced when taking TDF:

a.     On December 2, 2002, Gilead added that patients had suffered renal impairment, including increased creatinine, renal insufficiency, kidney failure, and Fanconi syndrome, with Viread use;

b.     On October 14, 2003, Gilead added more kidney disorders, including acute renal failure, proximal tubulopathy,[10] and acute tubular necrosis;[11]

c.     On May 12, 2005, Gilead added nephrogenic diabetes insipidus;[12] and

---

[6] When the kidney cannot filter the blood normally, a patient is usually diagnosed with "renal failure."

[7] If damage to the tubule prevents the reabsorption of beneficial molecules from filtrate, the levels of these beneficial compounds can become dangerously low in the blood. This is known as Fanconi syndrome.

[8] One of the compounds that is filtered both by the glomerulus and by secretion through the nephron tubule is creatinine. Creatinine is a compound that is produced by the breakdown of muscle tissue and created at a relatively constant rate by the body. If the kidney is damaged, the ability of the body to remove creatinine from the blood can be reduced, resulting in high levels of creatinine in the blood.

[9] Hypophosphatemia is a low level of phosphorus in the blood, which can indicate that the ability of the nephron tubule to reabsorb phosphorus from the filtrate is damaged.

[10] Proximal tubulopathy refers to damage or dysfunction to the portion of the nephron tubule that is closest to Bowman's capsule.

[11] Acute tubular necrosis refers to the death of the cells that line the nephron tubule.

[12] Nephrogenic diabetes insipidus refers to a condition characterized by the production of a large amount of dilute urine as a result of kidney dysfunction. It is thought to be related to damage to the nephron tubule.

d.  On March 8, 2006, Gilead added polyuria[13] and nephritis[14] to the list of renal and urinary disorders that patients had experienced while on TDF.

As Gilead knew, injuries were not limited to patients with a history of renal dysfunction or other risk factors.

102.  Gilead's long-term clinical data also demonstrated that TDF was damaging patients' bones. 48-week data showed greater decreases from baseline in bone mineral density at the lumbar spine and hip in patients taking Viread compared to those receiving other HIV drugs. At 144 weeks, there was a significantly greater decrease from baseline in bone mineral density at the lumbar spine in patients taking Viread compared to those receiving other HIV drugs, as well as significant increases in biochemical markers of bone turnover in patients taking Viread. And once Gilead began conducting clinical trials with Viread in adolescent and pediatric patients, the effects of TDF on adolescent and pediatric patients' bones were similar to the effects seen with adult patients.

103.  After Gilead brought Truvada to market, the medical literature continued to identify cases of TDF-associated kidney damage, including in patients without pre-existing renal dysfunction or co-administration with another nephrotoxic drug.

104.  Several new studies presented at the February 2006 Conference on Retroviruses and Opportunistic Infections ("CROI") highlighted the frequency of nephrotoxicity in TDF-treated patients. In one study, CDC investigators analyzed longitudinal data from 11,362 HIV-infected patients, all of whom had GFR >90mL/min at baseline, and found that treatment with TDF was significantly associated with mild and moderate renal insufficiency. In another, observational study of 497 patients initiating TDF treatment, 17.5% developed renal dysfunction. The most severe declines in renal function were associated with TDF treatment as part of a boosted regimen.

105.  In 2007, Gilead scientists published an article discussing the company's knowledge of TDF safety issues over the first four years of TDF treatment. Gilead reported that 0.5% of patients enrolled in a global expanded access program experienced a serious renal adverse event, including acute and chronic renal failure and Fanconi syndrome. A "serious" adverse event meant one resulting

---

[13] Polyuria refers to the excessive production of urine.
[14] Nephritis refers to the inflammation of the kidneys.

in hospitalization or prolongation of hospitalization, death, disability, or requiring medical intervention to prevent permanent impairment. Gilead also reported that through April 2005 the most common serious adverse events reported to Gilead's postmarketing safety database were renal events, including renal failure, Fanconi syndrome, and serum creatinine increase.

106.    Although this Gilead article demonstrates the company's clear and early knowledge of serious TDF toxicity in a significant number of patients, it downplayed the incidence of TDF-associated renal toxicity. In its Medical Review of the Stribild NDA, the FDA noted the limitations of Gilead's data, including the short duration of treatment, the voluntary nature of adverse event reporting in some countries, and the fact that Gilead only assessed serious adverse events, and not renal events leading to drug discontinuation or non-serious renal adverse events. According to the FDA, any of these factors may have led to an underestimation of the true incidence of renal events of interest. The FDA similarly questioned Gilead's data on the incidence of renal adverse events based on its postmarketing safety database given the voluntary nature of reporting.

107.    Moreover, even if Gilead's data accurately captured the percentage of patients experiencing serious renal adverse events (which it did not), it would still represent a very large number of patients who experienced significant health problems due to TDF toxicity. For example, in late 2015, according to data from Symphony Health Solutions, nearly 500,000 people in the U.S. were ingesting TDF daily. Using Gilead's numbers, approximately 2,500 of those patients would likely experience severe kidney damage. Now that TDF has been on the market for nearly two decades, many thousands of patients have likely experienced severe TDF-induced kidney damage.

108.    In May 2007, Gilead had to update its labeling to recognize that TDF-associated renal damage also caused osteomalacia (softening of the bones) in patients. In November 2008, Gilead modified the labeling to state that patients taking TDF had experienced osteomalacia due to proximal renal tubulopathy as bone pain, and that it might contribute to fractures.

109.    In August 2008, Gilead had to update its labeling to recognize finally that TDF caused both "new onset" and "worsening" renal impairment—meaning, as Gilead knew years prior, that TDF was injuring patients' kidneys even though they had no preexisting renal dysfunction.

110.    During 2009-2011, studies continued to show that TDF caused a significant loss of renal function in HIV-infected patients.

111.    Multiple articles described how the incidence of TDF-induced nephrotoxicity was underreported because studies often excluded patients who were likely to exhibit nephrotoxic effects, including patients who combined TDF in a ritonavir-boosted regimen or with another nephrotoxic drug, older patients or those with advanced HIV disease, or those with mild baseline renal dysfunction. Notwithstanding selection bias that tended to hide TDF-associated kidney dysfunction, the evidence was clear that TDF caused renal tubular dysfunction in a significant percentage of HIV-infected patients.

112.    In April 2012, researchers at the San Francisco Veterans' Administration Medical Center and the University of California, San Francisco published their analysis of the medical records of more than 10,000 HIV-positive veterans in the national VA healthcare system, which is the largest provider of HIV care in the United States. The study authors found that for each year of tenofovir exposure, risk of protein in urine—a marker of kidney damage—rose 34%, risk of rapid decline in kidney function rose 11%, and risk of developing chronic kidney disease rose 33%. The risks remained after the researchers controlled for other kidney disease risk factors such as age, race, diabetes, hypertension, smoking, and HIV-related factors.

113.    By the time it reviewed the Stribild NDA, the FDA stated that the safety profile of TDF was, by that point, "well-characterized in multiple previous clinical trials and is notable for TDF-associated renal toxicity related to proximal renal tubule dysfunction and bone toxicity related to loss of bone mineral density and evidence of increased bone turnover."[15]

114.    With each passing year and each successive TDF product, Gilead learned even more about TDF's toxicity. Despite this knowledge, Gilead repeatedly designed the TDF Drugs to contain TDF as the tenofovir delivery mechanism rather than safer TAF.

---

[15] FDA Center for Drug Evaluation and Research Summary Review for NDA 203100 at 10, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/203100Orig1s000SumR.pdf.

**D.     Before Gilead Developed Stribild, It Knew That Renal Adverse Events Were More Likely When Patients Took TDF As Part Of A Boosted Regimen.**

115.     Before Gilead first started marketing Viread, it knew that patients' exposure to tenofovir increases significantly when tenofovir is co-administered with a ritonavir-boosted protease inhibitor: the maximum concentration of tenofovir increased 31%; the minimum concentration of tenofovir increased 29%; and the area under the curve (the actual body exposure to the drug after dose administration) increased 34%.

116.     In the first few years TDF was on the market, many reported cases of tenofovir-related renal damage involved patients taking TDF with a ritonavir-boosted protease inhibitor—leading authors to conclude that the risk of TDF-associated renal toxicity increased for patients on a boosted regimen. This is consistent with other patient populations at increased risk for renal toxicity, including those with low body weight and those taking another nephrotoxic drug; each is associated with higher levels of tenofovir exposure.

117.     As Gilead recognized in the Precautions section of the July 1, 2004 Viread label: "[h]igher tenofovir concentrations could potentiate Viread-associated adverse events, including renal disorders."[16]

118.     Gilead further stated: "Atazanavir [another protease inhibitor] and lopinavir/ritonavir have been shown to increase tenofovir concentrations. The mechanism of this interaction is unknown. Patients receiving atazanavir and lopinavir/ritonavir and Viread should be closely monitored for Viread-associated adverse events. Viread should be discontinued in patients who develop Viread-associated adverse events."[17]

119.     Case study authors similarly called for careful monitoring of patients taking TDF in a boosted regimen, given the frequency of renal damage in such patients.

120.     A 2008 Journal of Infectious Diseases article reported that the odds of developing significant renal function reduction were 3.7 times higher for patients receiving a regimen containing

---

[16] Viread (tenofovir disoproxil fumarate) Tablets label at 17, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2004/21356slr010_viread_lbl.pdf.
[17] *Id.*

COMPLAINT FOR DAMAGES – 33
Case No.:
010759-11 1090516 V6

tenofovir plus ritonavir-boosted protease inhibitor than for those receiving tenofovir plus nonnucleoside reverse transcriptase inhibitor-based therapy, even after adjusting for viral load.

**E.      Before Gilead Developed Each of the TDF Drugs, It Knew that TAF Was Less Toxic to Kidneys and Bones than TDF.**

121.    Before the FDA approved Viread, Gilead had already discovered a different design for an orally available version of tenofovir that is more potent than TDF, meaning that it can be administered at a significantly lower dose with fewer side effects than TDF.

122.    Unlike TDF, TAF is not converted into tenofovir until it has been absorbed by the cell. As a result, TAF is more efficiently absorbed by the cells HIV targets compared to TDF. This more efficient absorption allows TAF to achieve far greater intracellular concentrations of the activated drug (tenofovir-diphosphate) in target cells than even a dramatically larger dose of TDF, while achieving plasma concentrations of tenofovir that are 90% lower than TDF. The lowered plasma concentrations of tenofovir found with TAF result in reduced toxicity compared to TDF, making TAF safer to use than TDF.

123.    On July 21, 2000, Gilead filed a provisional patent application which described TAF (then called GS-7340) as 2-3 times more potent than TDF while providing 10 times the intracellular concentration of tenofovir than TDF. Gilead also demonstrated that dosing with TAF resulted in dramatically higher concentrations of drug in all organs except the kidneys and the liver, compared with TDF. This suggested that TAF is uniquely able to target cells that HIV infects, while not concentrating in the kidney.

124.    In a 2001 paper, Gilead scientists described the remarkable results achieved when studying the metabolism of TAF in blood. The paper, "Metabolism of GS-7430, A Novel Phenyl Monophosphoramidate Intracellular Prodrug of PMPA, In Blood," compared the distribution of the active drug tenofovir in blood cells and plasma after exposure to either GS-7430 or tenofovir disoproxil (which was still in clinical development at the time of the study). What Gilead found was that one need only ***one thousandth of the dose*** of GS-7340 compared to tenofovir to achieve the same level of inhibition of HIV replication in vitro. Gilead also found that one need to use only one tenth the dose of GS-7340 compared to TDF to reach the same levels of active tenofovir inside cells.

125.     Gilead researchers presented the results of its GS-7340 study at a February 2002 Conference on Retroviruses. John Milligan, then Gilead's Vice President of Corporate Development and currently its President and Chief Executive Officer, said that Gilead's goal with GS-7340 was to deliver a more potent version of tenofovir that can be taken in lower doses, resulting in better antiviral activity and fewer side effects. Milligan said that "there's a great need to improve therapy for HIV patients."[18]

126.     Gilead's preclinical studies of TAF also indicated that TAF is less likely to accumulate in renal proximal tubules than TDF, supporting the potential for an improved renal safety profile.

127.     Gilead's 2001 10-K highlighted the benefits of GS-7340 over Viread: "Both GS 7340 and Viread are processed in the body to yield the same active chemical, tenofovir, within cells. However, the chemical composition of GS 7340 may allow it to cross cell membranes more easily than Viread, so that with GS 7340, tenofovir may be present at much higher levels within cells. As a result, GS 7340 may have greater potency than Viread and may inhibit low-level HIV replication in cells that are otherwise difficult to reach with reverse transcriptase inhibitors."[19]

128.     At the end of the first quarter of 2002, Gilead told investors that it had initiated Phase I/II testing of GS-7340. In an earnings call, Gilead stated that it had initiated a dose escalation study for GS-7340 through which Gilead intended to prove that GS-7340 was more potent than Viread, meaning that it could be administered at a safer, lower dose.

129.     In an October 28, 2003 earnings call, Gilead told analysts that data from the ongoing Phase I/II study of GS-7340 "look[ed] promising."[20]

130.     In December 2003, Mark Perry, then Gilead's Executive Vice President of Operations, told investors that Gilead was "excited" about GS-7340. Gilead expected GS-7340 to

---

[18] Special Coverage: 9th Conference on Retroviruses – New drugs, new data hold promise for next decade of HIV treatment, AIDS Alert, May 1, 2002.

[19] Gilead Sciences, Inc. Form 10-K For the fiscal year ended December 31, 2001 at 13, available at https://www.sec.gov/Archives/edgar/data/882095/000091205702011690/a2073842z10-k.htm.

[20] Event Brief of Q3 2003 Gilead Sciences Earnings Conference Call – Final, FD (Fair Disclosure) Wire, Oct. 28, 2003.

achieve "more potency at lower doses and increase the therapeutic index for" tenofovir.[21] The

"therapeutic index" is a comparison of the amount of a therapeutic agent that causes the therapeutic

effect compared to the amount that causes toxicity.

131.    In January 2004, Gilead repeatedly referred to the positive results from clinical

studies of GS-7340 in calls with analysts and disclosures to the investment industry. On a January

29, 2004 earnings call, Gilead stated that, based on these positive results, it was designing a Phase II

program for GS-7340 to determine the safety and efficacy of the compound in treatment naïve

patients and in highly treatment experienced patients.

132.    At a May 2004 Deutsche Bank Securities Healthcare Conference, Gilead said that it

knew GS-7340 could be dosed at a fraction of the Viread dose and give a greater antiviral response.

133.    However, on October 21, 2004, shortly after the FDA approved Truvada, Gilead

abruptly announced that it would abandon its GS-7340 design. It stated:

> Earlier this year as a result of positive data from a small phase I/II
> study of GS 7340, we began designing a phase II program to determine
> the safety and efficacy of the compound in treatment-naive patients
> and in highly treatment experienced patients. Since that time we have
> witnessed the increasing use of Viread across all HIV patient
> populations, and we have also received approval for and launched
> Truvada.
>
> Based on our internal business review and ongoing review of the
> scientific data for GS 7340, we came to the conclusion that it would be
> unlikely that GS 7340 would emerge as a product that could be highly
> differentiated from Viread.[22]

134.    Prior to its October 2004 announcement, Gilead never indicated that there might be an

issue with differentiating GS-7340 from Viread or expressed any other negative view of the

prospects of GS-7340. To the contrary, Gilead repeatedly touted the positive results of preclinical

and clinical studies of GS-7340 and the benefits of GS-7340 over Viread.

135.     Gilead's "internal business review" was the real driver of its decision to abandon a

design it knew to be safer than Viread.

---

[21] Gilead Sciences at Harris Nesbitt Gerard Healthcare Conference 2003 – Final, FD (Fair Disclosure) Wire, Dec. 11, 2003.

[22] https://www.gilead.com/news/press-releases/2004/10/gilead-discontinues-development-of-gs-9005-and-gs-7340-company-continues-commitment-to-research-efforts-in-hiv.

136.    In May 2005, despite Gilead's misrepresentation that GS-7340 was not worth pursuing, Gilead scientists reported the favorable results they achieved with GS-7340, including its benefits over Viread, in an issue of Antimicrobial Agents and Chemotherapy. Reuters Health News covered the article:

> After oral administration of GS 7340 to dogs, tenofovir concentrations were 5- to 15-fold higher in lymph nodes than after tenofovir DF administration, the researchers note. Except for kidney and liver, tissue concentrations of tenofovir were generally higher after GS 7340 than after tenofovir DF administration.

> "The high concentrations of tenofovir observed in lymphatic tissues after oral administration of GS 7340 are expected to result in increased clinical potency relative to tenofovir DF and could have a profound effect on the low-level virus replication that occurs in tissues with suboptimal drug exposure during HAART," the authors conclude.

> "With GS 7340," the researchers add, "it should be possible to reduce the total dose of tenofovir, thereby minimizing systemic exposure, while at the same time increasing antiviral activity."[23]

137.    Moreover, even though Gilead purportedly abandoned TAF, Gilead filed seven applications for patents on TAF between 2004 and 2005.

138.    Despite recognizing the safety benefits of TAF, Gilead kept its GS-7340 design on the shelf for years—knowingly exposing patients taking its TDF-containing drug products to greater risks of kidney and bone toxicity.

139.    It was not until approximately October 2010—*six years* after Gilead shelved its safer tenofovir prodrug and after Gilead designed combination products Truvada and Atripla to contain TDF rather than safer TAF—that Gilead renewed development of the safer TAF design.

140.    Once Gilead renewed development of its TAF design, it again touted the benefits of TAF over TDF—as if it had never falsely claimed that TAF could not be "highly differentiated" from TDF.

---

[23] Novel tenofovir prodrug preferentially targets lymphatic tissue, Reuters Health Medical News, June 1, 2005.

141.   Despite having discovered the benefits of TAF before 2001, Gilead repeatedly

misrepresented TAF as "new." The benefits of TAF that Gilead described in 2010 and

beyond were known to Gilead years earlier. And the clinical results Gilead achieved with

TAF would have been achieved years earlier but for Gilead's decision to slow-walk and

withhold the safer TAF design purely for financial gain.

142.   In an October 19, 2010 earnings call, Gilead's Chief Scientific Officer Norbert

Bischofberger explained to investors how GS-7340's safety profile was superior to Viread,

particularly with respect to kidney and bone toxicity:

> 7340 is a prodrug that actually delivers more active antivirally active
> components into the compartment in the body where it's really needed
> which means lymphocytes mostly. What that means is you can take a
> lower dose, and actually our clinical study would indicate 1/6th to
> 1/10th the Viread dose and you would actually get higher efficacy with
> less exposure. So we're looking at this to be used in sub population
> where people have a concern with Viread, and the one with renal
> impairment, elderly people that have reduced renal function, and the
> other population will be adults that have pre-existing or suspicion of
> bone disease, osteoporosis, and that's where we are initially going to
> position the compound.[24]

143.   Giving a statement at the Capital Markets Healthcare Conference on March 2, 2011,

John Milligan, then Gilead's President and Chief Operating Officer, told investors the real reason

Gilead previously refused to design its products to contain safer GS-7340—it did not want to hurt

TDF sales by stepping on its TDF marketing message:

> One of the reasons why we were concerned about developing 7340
> was we were trying to launch Truvada versus Epzicom[25] at that time.
> And to have our own study suggesting that Viread wasn't the safest
> thing on the market, which it certainly was at the time. . . . It didn't
> seem like the best. It seemed like we would have a mix[ed] message.
> And in fact that Viread story is split out to be a fairly safe product over
> the years. There are some concerns still on kidney toxicity and there
> are some concerns about bone toxicity.[26]

---

[24] Q3 2010 Gilead Sciences Earnings Conference Call – Final, FD (Fair Disclosure) Wire, Oct. 19, 2010.

[25] Epzicom is a combination medication, containing abacavir and lamivudine, indicated to treat HIV sold by Gilead's competitor GlaxoSmithKline, now Viiv Healthcare, Ltd. The FDA approved both Epzicom and Truvada in August 2004.

[26] Gilead Sciences at RBC Capital Markets Healthcare Conference – Final, FD (Fair Disclosure) Wire, Mar. 2, 2011.

COMPLAINT FOR DAMAGES – 38
Case No.:
010759-11 1090516 V6

144.   Milligan called GS-7340 a "kinder, gentler version of Viread."[27]

145.   At the March 14, 2011 Roth Capital Partners Growth Stock Conference, Gilead stated that the ability to dose GS-7340—the "kinder, gentler" version of Viread—lower than Viread was important because GS-7340 is safer, particularly as patients take the medication for the long term.[28]

146.   At the NASDAQ OMS 26th Investor Program in June 2011, Gilead described GS-7340 as a "very exciting product" which was then in dosing studies to determine just how low GS-7340 could be dosed. Gilead explained the benefit of lower dosing to aging patients and those who have been on the medication for a long time:

> And we had recently this year had presented 14-day monotherapy results from a study we had done at 50 and 100 mg of 7340 versus the 300 mg of Viread today. And what we have shown was viral load reductions were greater in the lower doses of 7340 and the plasma tenofovir levels were actually much reduced from what we see with Viread.
>
> We're currently now in a Phase Ib looking at even lower doses. We are studying 8 mg, 25 and 40 mg of GS-7340. This is important because as the age of the AIDS population continues to increase, as the median age is now just about 50 years old, you get issues with aging such as renal function and bone mineral density that can become bigger issues for these patients and we think that it's a currently unmet medical need to address those concerns of the aging population in HIV.[29]

Yet, Gilead knew well before 2010-2011 that people with HIV were living longer lives. Since the introduction of effective combination antiretroviral therapy in late 1995 and early 1996, many people with HIV have lived a normal lifespan.

147.   On January 24, 2012, Gilead announced that it had begun Phase II clinical trials of GS-7340 and identified a dose that is ten times lower than Viread while providing greater antiviral efficacy.

148.   On October 31, 2012, Gilead announced that a Phase II clinical trial evaluating TAF met its primary objective. The study compared a once-daily single tablet regimen containing TAF 10

---

[27] *Id.*

[28] Gilead Sciences at Roth Capital Partners OC Growth Stock Conference – Final, FD (Fair Disclosure) Wire, Mar. 14, 2011.

[29] Gilead Sciences Inc. at NASDAQ OMS 26th Investor Program – Final, FD (Fair Disclosure) Wire, June 21, 2011.

mg/elvitegravir 150 mg/cobicistat 150 mg/emtricitabine 200 mg with Stribild (TDF 300 mg/elvitegravir 150 mg/cobicistat 150 mg/emtricitabine 200 mg) among treatment-naïve adults. Compared to Stribild, the TAF-containing regimen demonstrated better markers of bone and kidney effects that were statistically significant. The study showed that TAF is effective at a fraction of the dose of Viread and provides safety advantages.

149.    In January 2013, Gilead began Phase III clinical development of TAF. Announcing the beginning of Phase III development, then-CEO Martin mischaracterized TAF as "new."[30]

150.    Gilead finally submitted an application to market its first TAF-containing product, Genvoya, to the FDA on November 5, 2014 (though it could have done so years earlier had it not shelved the safer design to make more money).

151.    When the FDA approved Genvoya on November 5, 2015, John C. Martin, then Chairman and CEO of Gilead, announced that "there is still a need for new treatment options that may help improve the health of people as they grow older with the disease."[31] Martin misrepresented that TAF was "new" and concealed that Gilead had known about this safer version of tenofovir for over a decade but purposefully withheld it from the market solely to protect its monopoly profits and extend Gilead's ability to profit on TAF regimens for the next decade or more.

**F.    Gilead Withheld its Safer TAF Design to Protect its TDF Sales and Extend Profits on its HIV Franchise.**

152.    Gilead first developed and sought FDA approval for its TDF line of products even though it knew TAF was safer.

153.    Then Gilead shelved its TAF design in 2004 because it did not want to hurt TDF sales by admitting that TDF is unreasonably and unnecessarily unsafe.

154.    Gilead continued to withhold its TAF design for the next decade. Gilead knew that by withholding the safer TAF design, it could extend the longevity of its HIV drug franchise and make

---

[30] Gilead Sciences at JPMorgan Global Healthcare Conference – Final, FD (Fair Disclosure) Wire, Jan. 7, 2013.

[31] US FDA approvals Gilead's Single Table Regiment Genvoya for Treatment of HIV-1 Infection, Business Wire, Nov. 5, 2015.

billions two times over: first, with TDF medications until TDF patent expiration, which would begin by no later than 2018, and second, with TAF medications until TAF patent expiration as late as 2032.

155.    But Gilead also knew that timing was key. While it wanted to delay the TAF-designed products to maximize profits on its TDF Drugs, it also knew that it had to get its TAF-based products on the market sufficiently in advance of TDF patent expiration. Gilead knew that once doctors switched their patients from TDF to TAF, doctors would be highly unlikely to switch their patients back to TDF-based regimens once generic TDF became available. By converting TDF prescriptions to TAF prescriptions (which cannot be automatically substituted at the pharmacy counter with a generic TDF product), Gilead could save a substantial percentage of sales from going generic.

156.    Only once Gilead had realized billions in sales through most of the TDF patent life—having built Viread sales up to $1.1 billion and the TDF portfolio up to $11 billion in sales in 2015—did Gilead create TAF-based versions of its prior TDF Drugs and work to convert its TDF Drug sales to TAF drug sales.

157.    Once TAF entered the market, Gilead successfully convinced a large percentage of doctors to switch from TDF-based to TAF-based regimens by highlighting TAF's improved safety profile with respect to bone and kidney toxicity—the very benefits that Gilead could have and should have incorporated into its product design from the beginning but withheld from patients with each successive TDF Drug for over a decade.

158.    In addition, by delaying the filing of an NDA for its first TAF product, for which it received five-year regulatory exclusivity, Gilead knew that it was also delaying the entry of any generic manufacturer who could successfully challenge Gilead's TAF patents as invalid or not infringed. Due to its regulatory exclusivity, no generic manufacturer can even file an ANDA with a Paragraph IV certification seeking to market a generic version of Genvoya until November 2019 and then, upon Gilead's suit against the generic, Gilead can automatically delay generic entry by up to an additional 30 months.

159.    Gilead boasted about TAF's potential to extend its HIV franchise, which has been the core of its business.

COMPLAINT FOR DAMAGES – 41
Case No.:
010759-11 1090516 V6

160.    Milligan told investment analysts in 2010 that the safer TAF-designed products could replace the whole TDF franchise which would provide a "great deal of longevity. . . ."[32] Milligan similarly told investors at a Deutsche Bank Securities Inc. Healthcare Conference in May 2011 that TAF was a "new" drug that "could potentially bring quite a bit of longevity to the Gilead portfolio."[33]

161.    As Milligan told analysts at a Goldman Sachs Global Healthcare Conference in June 2011, Gilead would be "offering a product called 7340, which we believe is a lower dose, better safety profile, more potent, differentiated drug relative to Viread. And so, our ability to develop and get that onto the market prior to [TDF] patent expiration will be key to us, to maintain the longevity."[34]

162.    Gilead withheld its safer TAF design until it suited Gilead's bottom line at the expense of patients' health.

**G.    Gilead Knowingly Designed its TDF Drugs To Be Unreasonably Dangerous and Unsafe to Patients' Kidneys and Bones.**

163.    Despite knowing that TDF causes kidney and bone damage and that TAF is safer for patients' kidneys and bones, Gilead designed the TDF Drugs to contain TDF rather than safer TAF as the orally available version of tenofovir.

164.    In addition to withholding the safer TAF design of Stribild, Gilead made Stribild even more dangerous to patients when it formulated the drug to include 300 mg TDF with cobicistat.

165.    Stribild is a fixed dose combination containing 300 mg TDF, emtricitabine, elvitegravir, and cobicistat. Elvitegravir is an integrase strand transfer inhibitor (INSTI). Cobicistat has no antiretroviral effect; it is a pharmacoenhancer that increases the plasma concentrations of elvitegravir. Regimens that include a pharmacoenhancer like cobicistat are called "boosted" regimens.

---

[32] Gilead Sciences at 22nd Annual Piper Jaffray Healthcare Conference – Final, FD (Fair Disclosure) Wire, Nov. 30, 2010.

[33] Gilead Sciences Inc. at Deutsche Bank Securities Inc. Health Care Conference – Final, FD (Fair Disclosure) Wire, May 3, 2011.

[34] Gilead Sciences Inc. at Goldman Sachs Global Healthcare Conference – Final, FD (Fair Disclosure) Wire, June 7, 2011.

166.     Gilead's early development of elvitegravir used ritonavir as the boosting agent. Gilead knew before Viread entered the market in 2001 that coadministration of TDF with ritonavir-boosted lopinavir significantly increased tenofovir concentrations. By 2004, the Viread label warned doctors to carefully monitor patients taking both TDF and ritonavir/lopinavir. And scientific literature published years before Gilead developed Stribild indicated that renal toxicity associated with TDF was more frequent in patients receiving TDF in combination with boosted protease inhibitors.

167.     Although Gilead ultimately replaced ritonavir with cobicistat as the boosting agent in Stribild, the two boosters are structurally similar. Gilead learned during development of Stribild that tenofovir levels in patients receiving Stribild (TDF with cobicistat) were similar to the tenofovir levels experienced in patients who took TDF in combination with a ritonavir-boosted protease inhibitor. Gilead knew that tenofovir levels are 25-35% higher when combining TDF in a boosted regimen.

168.     Despite knowing that combining TDF with cobicistat would significantly increase tenofovir levels in patients' blood, Gilead did not reduce the dose of TDF when it formulated Stribild. Gilead's Stribild clinical trials showed an increased rate of serious renal adverse events that led to treatment discontinuation. Stribild is even more toxic to patients' kidneys and bones than unboosted TDF.

169.     When Gilead formulated its first TAF-based drug, Genvoya—which was Stribild with TAF in place of TDF—Gilead reduced the dose of TAF to account for the fact that cobicistat increases tenofovir concentrations. A Phase I TAF dosing trial showed that TAF 25 mg was the optimal dose to achieve activity similar to a 300 mg dose of TDF. When formulating Genvoya, however, Gilead further reduced the TAF dose to 10 mg because, when given with cobicistat, TAF 10 mg achieves exposure similar to TAF 25 mg when given without cobicistat.

170.     Gilead knew to reduce the dose of TAF to 10 mg when given with cobicistat before Gilead sought FDA approval for Stribild. Pursuant to Gilead's Phase I study GS-US-311-0101, conducted between June 6, 2011 and August 31, 2011, Gilead determined that co-administration of TAF with cobicistat significantly increased the body's exposure to TAF and active tenofovir. It found that the body's drug exposure across time (known as the "area under the curve" in

pharmacokinetic parlance) increased 2.7-fold with respect to TAF and 3.3-fold with respect to

tenofovir when given with cobicistat. Gilead addressed this drug interaction by reducing the dose of

TAF from 25 mg to 10 mg in the Genvoya tablet. When Gilead began its study GS-US-292-0103 on

October 5, 2011, it used a TAF dose of 10 mg in the Genvoya combination because "the TAF dose is

10 mg when combined with COBI in the [fixed dose combination] versus 25 mg when not combined

with COBI."[35]

      171.    Critically, Gilead reduced the TAF dose when formulating Genvoya even though

patients' plasma exposure to tenofovir when taking TAF is already significantly less than their

tenofovir exposure when taking TDF due to TAF's enhanced entry and absorption into target cells.

      172.    Moreover, in July 2011, months before Gilead submitted its Stribild NDA to the FDA,

Gilead sought FDA approval of reduced doses of TDF (Viread) in 150 mg, 200 mg, and 250 mg

strengths for the treatment of HIV-1 infection in pediatric patients ages 2-12. That same month,

Gilead also sought approval of Viread 40 mg oral powder for the treatment of HIV-1 infection in

pediatric patients 2 years and older.[36] The FDA approved the lower dosage strength TDF tablets and

oral powder in early January 2012—over six months before the FDA approved the Stribild NDA.

There was no reason Gilead could not have similarly reduced the dose of TDF in Stribild—when it

knew that failing to reduce the dose would increase the drug's toxicity.

      173.    As a direct result of Gilead's decision not to use a safer design, Stribild proved to be

toxic to patients' kidneys and bones.

      174.    In the clinical trials of Stribild over 48 weeks, eight patients in the Stribild group

compared to one in the comparator groups discontinued the drug study due to renal adverse events,

including kidney failure and Fanconi Syndrome. Four of these patients developed laboratory findings

consistent with proximal renal tubular dysfunction. The laboratory findings in these four subjects

---

[35] FDA Center for Drug Evaluation and Research, Genvoya NDA 207561 Clinical Pharmacology and Biopharmaceutics Review(s) at 32, available at
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2015/207561Orig1s000ClinPharmR.pdf.

[36] In the EU, Gilead recommends that adults with creatinine clearance below 50 mL/min take Viread oral powder to reduce their doses of TDF.

improved but did not completely resolve upon discontinuation of Stribild. The signature toxicity of the Stribild group was proximal renal tubular dysfunction.

175.    The FDA's Medical Review described the notable adverse events that led to study discontinuation more frequently in the Stribild group as a "constellation of renal [Adverse Events] (e.g. renal failure, Fanconi syndrome, and increased blood creatinine)."[37]

176.    According to the FDA, the "most important safety risks of Stribild use are associated with two key toxicities: renal adverse events (particularly proximal renal tubular dysfunction) and bone toxicity. Both of these events have previously been associated with use of TDF . . . ."[38]

177.    The FDA noted that "published literature suggests that the renal toxicity associated with TDF may be more frequent in patients receiving TDF in combination with PIs, including ritonavir,"[39] and the "review team remains concerned that COBI may exacerbate the known renal toxicity associated with TDF."[40] In its Summary Review of the Stribild NDA, the FDA concluded: "it appears that the combination of COBI with TDF may have more renal toxicity than TDF alone as highlighted in the clinical reviews and the renal consult."[41] The FDA expressed concern that the data reviewed for the Stribild NDA represented an increased hazard signal even compared to regimens containing TDF combined with another boosting agent.

178.    Due to Stribild's renal toxicity, Stribild use is restricted in patients with impaired renal function. Stribild's label states that doctors should not initiate Stribild in patients with estimated creatinine clearance below 70 mL per minute, and Stribild should be discontinued if estimated creatinine clearance declines below 50 mL per minute as dose interval adjustment cannot be achieved. Moreover, in the EU—though not in the U.S. —Gilead warns doctors that Stribild

---

[37] FDA Center for Drug Evaluation and Research Stribild NDA 203100 Medical Review at 9, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/203100Orig1s000MedR.pdf.

[38] FDA Center for Drug Evaluation and Research Stribild NDA 203100 Cross Discipline Team Member Review at 17, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/203100Orig1s000CrossR.pdf.

[39] *Id*. at 18.

[40] *Id*.

[41] FDA Center for Drug Evaluation and Research Stribild NDA 203100 Summary Review at 16, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/203100Orig1s000SumR.pdf.

should not be initiated in patients with creatinine clearance below 90 mL per minute unless, after review of all available treatment options, it is considered that Stribild is the preferred treatment for the individual patient.

179.     Gilead's post-approval Stribild data continued to show renal adverse effects. In the clinical trials of Stribild over 96 weeks, two additional Stribild patients discontinued the study due to a renal adverse reaction. In the clinical trials of Stribild over 144 weeks, three additional Stribild patients discontinued the study due to a renal adverse reaction. In addition, one patient who received ritonavir-boosted atazanavir plus Truvada (i.e., a boosted TDF regimen) in the comparator group developed laboratory findings consistent with proximal renal tubular dysfunction leading to drug discontinuation after week 96.

**H.     Gilead Obtained FDA Approval for its TAF-Based Products by Relying on Studies Demonstrating TAF's Superiority over TDF.**

180.     In seeking FDA approval of its first TAF-based antiviral drug product, Genvoya, Gilead told the FDA that TAF has better entry and concentration in HIV-target cells than TDF, thereby allowing the administration of smaller doses and reducing systemic tenofovir exposure, renal toxicity and bone effects, without sacrificing efficacy.

181.     Gilead established during Phase I clinical development of TAF that doses as low as 8 to 25 mg of TAF had antiviral activity comparable to the approved dose of TDF 300 mg. Gilead selected the 25 mg TAF dose as the optimal dose for Phase 2 and 3 studies based on its antiviral activity. Gilead included TAF 10 mg in Genvoya because it provides similar exposures to TAF 25 mg when coadministered with cobicistat.

182.     Gilead supported the safety and efficacy of Genvoya with two clinical trials that compared Genvoya to its TDF-containing counterpart, Stribild. In those studies, a 10 mg oral dose of TAF in Genvoya resulted in greater than 90% lower concentrations of active tenofovir in plasma as compared to a 300 mg oral dose of TDF in Stribild. Due to these lower plasma concentrations, Gilead expected that the kidney and bone toxicities associated with TDF would occur at a lower rate with TAF. And, as expected, the trials showed that rates of biomarkers for tenofovir-induced renal and bone toxicities were less with Genvoya than Stribild.

183.     In seeking FDA approval of Genvoya in 2014, Gilead relied on TAF data obtained by Gilead more than a decade earlier—before the company abruptly shelved its TAF design in pursuit of more money. Gilead submitted in its Genvoya NDA data from: (a) early clinical development showing that TAF provided greater intracellular distribution of tenofovir yielding lower plasma tenofovir levels than TDF; (b) preclinical studies that indicated TAF is less likely to accumulate in renal proximal tubules, supporting the potential for an improved renal safety profile; and (c) Phase I dosing studies supporting doses of TAF far lower than the standard 300 mg dose of TDF.

184.     Reviewing these studies, the FDA stated that: "Based on the design of the pivotal clinical trials, safety can be directly compared between TAF (Genvoya) and TDF (as Stribild) in subjects initiating treatment."[42] According to the FDA, the studies showed that "the rates of signature TFV [tenofovir] toxicities related to bone mineral density and renal laboratory parameters were lower [than TDF], likely due to the fact that the TAF prodrug yields lower plasma concentrations of TFV."[43]

185.     As a result of its improved renal safety profile over TDF, Gilead's TAF-containing products are better tolerated by patients with renal impairment.

186.     For example, Genvoya requires no dosage adjustment for patients with creatinine clearance greater than or equal to 30 mL per minute, whereas its TDF-containing counterpart Stribild is not recommended for patients with creatinine clearance below 70 mL per minute and Stribild should be discontinued if creatinine clearance falls below 50 mL per minute as dose interval adjustment cannot be achieved. Due to its superior safety profile, Genvoya has an expanded indication for renally impaired individuals with creatinine clearance greater than or equal to 30 mL per minute.

---

[42] FDA Center for Drug Evaluation and Research Genvoya NDA 207561 Summary Review at 10, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2015/207561Orig1s000SumR.pdf.

[43] *Id*. at 15.

COMPLAINT FOR DAMAGES – 47
Case No.:
010759-11 1090516 V6

187.    As a result of its improved bone toxicity safety profile over TDF, the labels for Gilead's TAF-containing products no longer include bone effects in the Warnings and Precautions sections of the those labels.

188.    The FDA agreed that bone effects need only be displayed in the Adverse Events section of TAF drug labeling because "[w]ith respect to bone toxicity, TAF appears to have substantially less of an adverse effect on bone mineral density (BMD) than TDF."[44]

189.    Gilead removed bone toxicity from the Warnings and Precautions sections of the Genvoya label in December 2016 and from the Odefsey and Descovy labels in 2017. Bone toxicity remains in the Warnings and Precautions sections of the labels of Gilead's TDF Drugs to this day.

**I.      Gilead Markets TAF as Superior to TDF.**

190.    Gilead's TAF-based product websites, including the Genvoya site, market the TAF-based drugs as superior to Gilead's TDF-containing products with respect to kidney health. Gilead recognizes that: "Kidneys play a key role in keeping you healthy, working around the clock to remove waste from your blood. That's why it's so important to take care of them, especially if you have HIV-1."[45] Gilead states that the TAF-based products have "less impact on kidney lab tests" than other approved HIV-1 treatments, including Stribild, Atripla, and Truvada. The website also highlights that unlike its TDF products, the TAF-based products are "FDA-approved for people with mild-to-moderate kidney problems and can be used in some people with lowered kidney function without changing the dose."[46]

191.    Gilead's TAF-based product websites, including the Genvoya site, market the TAF-based drugs as superior to Gilead's TDF-containing products with respect to bone health. Gilead recognizes that: "Because HIV-1 medicines may impact your bones, it's important to protect your bone health. If you're under 30 years of age, you're still developing bone mass. If you're over 30, your bones have fully developed and it's important to try to maintain them."[47] The site touts clinical

---

[44] FDA Center for Drug Evaluation and Research Vemlidy NDA 208464 Summary Review at 5, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/208464Orig1s000SumR.pdf.

[45] *See* https://www.genvoya.com/hiv-kidney-bone-health.

[46] *Id*.

[47] *Id*.

studies which demonstrate that the TAF-containing products "had less impact on hip and lower spine bone mineral density than the other approved HIV-1 treatments," including Stribild, Atripla, and Truvada.[48]

192.    Gilead also touts TAF as safer than TDF to scientists, clinical investigators, and doctors attending the annual Conference on Retroviruses and Opportunistic Infections ("CROI").

193.    In 2015, Gilead scientists presented to CROI attendees data evaluating the safety and efficacy of Genvoya in patients with mild to moderate renal impairment. Gilead stated that "TDF has been associated with clinically significant renal and bone toxicity," and "[r]elative to TDF 300 mg, TAF at an equivalent dose of 25 mg has 90% lower circulating plasma TFV, while maintaining high antiviral activity."[49] This first study of a single-tablet antiviral regimen without dose adjustment in patients with mild to moderate renal impairment demonstrated the efficacy and renal and bone safety of Genvoya in this patient population.

194.    In 2016, Gilead scientists presented to CROI attendees data evaluating the renal safety of TAF in patients with a high risk of kidney disease. Gilead stated that TDF "has been associated with an increased risk of [chronic kidney disease] . . . . " and "[d]ue to a 91% lower plasma tenofovir level, tenofovir alafenamide (TAF) relative to TDF has demonstrated a significantly better renal safety profile and no discontinuations due to renal adverse events through 2 years in 2 randomized, double-blind studies . . . comparing TAF to TDF . . . . "[50] With respect to high risk renal patients, Gilead concluded that "[a]ntiretroviral-naïve adults with both high and low risk for [chronic kidney disease] treated with TAF had more favorable renal outcomes compared to those treated with TDF."[51]

195.    Gilead also presented at the 2016 CROI data demonstrating that TAF is safer to kidneys than TDF in the longer-term. Showing data through 96 weeks, Gilead concluded that

---

[48] *Id.*

[49] http://www.croiconference.org/sites/default/files/posters-2015/795.pdf.

[50] http://www.croiconference.org/sites/default/files/posters-2016/681.pdf.

[51] *Id.*

"[c]linically significant renal events were less frequent in patients receiving" TAF vs. TDF and these "data provide further support for the improved renal safety profile of TAF compared with TDF."[52]

196.    In 2017, Gilead scientists presented to CROI attendees data showing that switching patients with low bone mineral density from a TDF-based to a TAF-based regimen results in increased BMD and a reversion from osteoporosis, leading Gilead to conclude that "[s]witching from TDF to TAF may be an important treatment strategy to increase bone mineral density in those at the highest fracture risk."[53]

197.    Also in 2017, Gilead scientists presented to CROI attendees 144-week data establishing the superiority of TAF over TDF with respect to efficacy as well as kidney and bone safety. At week 144, TAF: was "superior to [TDF] on virologic efficacy," had "significantly less impact than [TDF] on renal biomarkers," and had "significantly less impact than [TDF] on BMD."[54]

198.    In 2018, Gilead scientists presented to CROI attendees 96-week data that showed that switching to a TAF-based regimen resulted in "significant increases in bone mineral density at hip and spine" and "improved biomarkers of renal tubular function."[55]

199.    Gilead's sales force has used data showing the superior safety profile of TAF over TDF to convince doctors to switch patients from TDF-based to TAF-based products.

200.    Gilead President and COO Milligan told analysts during a November 10, 2015 Credit Suisse Healthcare Conference that he expected Gilead's sales representatives to be successful in switching the market from TDF to Genvoya based on favorable data showing the benefits of TAF over TDF. Milligan viewed switching patients from Stribild to Genvoya as "the most likely thing to happen very commonly, because it's very seamless for the patient. You're not really changing much; you're just getting a better version of Stribild."[56] Milligan also touted the benefit of switching Atripla

---

[52] http://www.croiconference.org/sites/default/files/posters-2016/682.pdf.
[53] http://www.croiconference.org/sites/default/files/posters-2017/683_Brown.pdf.
[54] http://www.croiconference.org/sites/default/files/posters-2017/453_Arribas.pdf.
[55] http://www.croiconference.org/sites/default/files/posters-2018/1430_Mills_504.pdf.
[56] Gilead Sciences Inc. at Credit Suisse Healthcare Conference – Final, FD (Fair Disclosure) Wire, Nov. 10, 2015.

patients, who, at that point, had a decade of TDF toxicity buildup, to Genvoya, which, he said, gives

patients the benefits of TDF with a better safety profile.

201.    In order to prevent or combat the cumulative buildup of kidney and bone toxicity

associated with TDF (which Gilead itself caused by withholding the safer TAF design), Gilead's

message was: "if you're a new patient, start with a TAF-based single-tablet regimen, because that's

going to be highly efficacious and very safe and very tolerable for long-term usage. And if you're on

a Viread-based regimen, it's a great idea to convert, switch, upgrade to a TAF-based regimen as soon

as possible."[57]

202.    According to Milligan, Genvoya was the most successful launch ever for an HIV

therapy. After six months on the market, Genvoya was the most prescribed regimen for treatment-

naïve and switch patients.

203.    Gilead's conversion strategy continued with FDA approval of Gilead's subsequent

TAF-based products. As Milligan stated in March 2016, the marketplace was moving to TAF

because patients need the safest possible medication:

> [A]s I look at TAF right now there's a very strong medical rationale for TAF versus
> Viread. And so what we're seeing in the marketplace with the launch of Genvoya and
> then with the recent approval of Odefsey is the desire to move patients from a TDF
> containing regimen to a TAF containing regimen. . . it's very interesting that the field
> wants to move to the safest medication, I think should move to the safest medication
> because it's a great opportunity for patients to stay on care for another 10 to 20 years
> which is really where we're at with most of these patients. They're going to need
> decades more care and so you need the gentlest, safest option for patients. . . . [58]

204.    Gilead's 2017 Annual Report attributes strong growth in its HIV business to

"widespread physician acceptance and uptake" of the TAF-based regimens.[59]

205.    In January 2018, Milligan stated that "physicians and patients prefer TAF

dramatically over our TDF-containing backbones," noting that its TAF-based products had achieved

---

[57] Gilead Sciences Inc. at Piper Jaffray Healthcare Conference – Final, FD (Fair Disclosure) Wire, Dec. 1, 2015.

[58] Gilead Sciences Inc. at Barclays Global Healthcare Conference – Final, FD (Fair Disclosure_ Wire, Mar. 15, 2016.

[59] Gilead Sciences 2017 Year in Review at 7, available at https://www.gilead.com/-/media/files/ pdfs/yir-2017-pdfs/final%20year%20in%20review%20426.pdf.

1    more than 56% of the market share of its TDF-containing regimen.[60] TAF-based products now make

2    up at least 74% of Gilead's TDF- and TAF-based drug products for HIV treatment.

3        206.    Gilead could have and should have incorporated the benefits of TAF, which doctors

4    and patients "prefer dramatically" over TDF, into its products years earlier.

5  **J.    Gilead Failed to Adequately Warn about the Risks of TDF.**

6        207.    In addition to withholding a safer TAF-based design despite knowing the risk its TDF

7    Drugs posed to patients' kidneys and bones, Gilead failed to adequately warn physicians and patients

8    about the risks and safe use of TDF.

9        **1.    Gilead Failed to Adequately Warn Doctors about the Risks of TDF.**

10        208.    Because tenofovir is primarily cleared out of the body by the kidneys, a patient

11    experiences even greater exposure to tenofovir as the kidneys become impaired—causing even

12    greater harm. As a result, early detection is key to preventing serious, potentially irreversible renal

13    injury. Frequent monitoring for TDF-induced toxicity is also critical because patients are typically

14    asymptomatic in the early stages. Gilead, however, downplayed the risks of TDF and the need to

15    monitor all patients in order to inflate sales.

16        209.    During the first years Viread was on the market, Gilead relied on Viread sales for a

17    significant portion of its operating income. For 2002, Viread's first full year on the market, Viread

18    sales comprised 53% of Gilead's total product sales. In 2003, Viread accounted for 68% of Gilead's

19    total product sales.

20        210.    Gilead stated in its 2002 10-K that its operations would suffer if Viread did not

21    maintain or increase its market acceptance. Gilead also stated that if additional safety issues were

22    reported for Viread, this could "significantly reduce or limit our sales and adversely affect our results

23    of operations."[61] Gilead made similar statements in its 2003 and 2004 10-K filings.

---

[60] Gilead Sciences Inc. at JPMorgan Healthcare Conference – Final, FD (Fair Disclosure) Wire, Jan. 8, 2018.

[61] Gilead Sciences, Inc. Form 10-K For the fiscal year ended Dec. 31, 2002 at 24 available at https://www.sec.gov/Archives/edgar/data/882095/000104746903008695/a2105292z10-k.htm.

211.     To make sure that safety issues did not depress or slow the growth of Viread sales, which were crucial to Gilead's operations, Gilead dramatically increased its sales force and marketing budget, and trained its sales representatives to misrepresent Viread's safety profile. At the direction of Gilead's senior management, Gilead representatives told doctors that Viread was a "miracle drug," "extremely safe," and "extremely well-tolerated" with "no toxicities."

212.     According to a 2009 shareholder lawsuit filed against Viread, Viread's then-Chief Executive Officer John C. Martin frequently referred to Viread as a "miracle drug" at sales force meetings. According to a former employee, Gilead was trying to overcome the perception in the medical community that Viread was like Gilead's previous HIV drugs and would likely cause kidney damage.

213.     On March 14, 2002, FDA sent Gilead a Warning Letter admonishing Gilead for engaging in promotional activities that contained false and misleading statements in violation of the Federal Food, Drug and Cosmetic Act. The FDA stated that Gilead unlawfully minimized Viread's risks, including with respect to kidney toxicity, and overstated its efficacy.

214.     Despite this warning, Gilead continued to unlawfully promote Viread by minimizing its safety risks. During a June 2003 sales force training, Gilead instructed sales representatives to respond to anticipated physician concerns about Viread's nephrotoxicity by downplaying that many patients taking Viread had experienced the adverse effects of kidney toxicity—some of them severe —including but not limited to renal failure, acute renal failure, Fanconi syndrome, proximal tubulopathy, increased creatinine, and acute tubular necrosis.

215.     The FDA issued another Warning Letter to Viread on July 29, 2003, stating that Gilead's sales representatives had repeatedly omitted or minimized material facts regarding the safety profile of Viread. Among other things, the FDA required Gilead to retrain its sales force to ensure that Gilead's promotional activities complied with the Federal Food, Drug and Cosmetic Act and accompanying regulations. But Gilead had achieved its goal: rapidly increased Viread sales.

216.     In subsequent years, Gilead continued to downplay the risks of TDF-induced toxicity when promoting its TDF Drugs to doctors by misrepresenting the drug as safe, dismissing case reports of acute renal failure and other TDF-associated adverse events as purportedly unavoidable

side effects of tenofovir in an otherwise "safe" drug, and discouraging doctors from monitoring patients for drug-induced toxicity using more sensitive markers of kidney function.

217.    In addition to misrepresenting the safety profile of TDF when promoting TDF to doctors, Gilead also downplayed the importance of patient monitoring in its TDF Drug labeling despite the importance of early detection of TDF-induced toxicity. The dangerous inadequacies in Gilead's drug labeling were compounded by the misleading marketing messages it gave to doctors.

218.    From Viread's product approval on October 26, 2001 through May 20, 2007, Gilead's TDF labeling failed to warn doctors that all patients needed to be monitored for adverse kidney effects. During this time, Gilead only recommended monitoring patients taking TDF Drugs for renal adverse effects if patients were at risk for, or had a history of, renal impairment or if they were taking another nephrotoxic drug. This monitoring recommendation was woefully inadequate because, as Gilead was well aware, TDF-associated renal toxicity had harmed patients who were not at risk for, or did not have a history of, renal impairment.

219.    Gilead failed to include any warning about the need to monitor bone effects until October 14, 2003 and that warning was limited to patients with certain risk factors. Since then, Gilead has only suggested that doctors monitor, and only informs patients that monitoring may be necessary, for patients with certain risk factors for bone adverse effects.

220.    Gilead failed to warn about the need for universal monitoring even though it knew that all patients taking TDF are at risk for renal and bone adverse effects.

221.    Gilead failed to warn about the need for universal monitoring even after patients without pre-existing risk factors experienced kidney and bone effects.

222.    Gilead failed to warn about the need for universal renal monitoring even though patients with a certain level of renal impairment should not take its TDF products or, if TDF products are to be administered to certain renally impaired patients, the dosing interval must be adjusted. The Viread and Truvada labels require a dosing interval adjustment for patients with creatinine clearance of 30-49 mL per minute, and Complera cannot be taken by patients with a creatinine clearance of less than 50 mL per minute. Frequent monitoring of all patients' kidney function is necessary to

1    ensure that patients' kidneys are healthy enough to continue treatment or patients receive a needed

2    dose interval adjustment.

3        223.    By failing to warn doctors to monitor all patients for TDF-associated toxicity, Gilead

4    delayed the diagnosis of TDF-associated harm, causing or enhancing injuries that would have been

5    prevented or lessened through early detection.

6        224.    On May 21, 2007, Gilead added to the Viread label a recommendation that doctors

7    calculate creatinine clearance (one measure of kidney function) in all patients before initiating

8    treatment with a TDF-based product and as clinically appropriate during therapy. Gilead

9    recommended monitoring of creatinine clearance and serum phosphorus only for patients at risk for

10   renal impairment.[62]

11       225.    The "all patients" monitoring recommendation for Viread, Truvada, Atripla, and

12   Complera remained inadequate because it instructed doctors to assess just one, insufficiently

13   sensitive marker of kidney function.[63] Without using sufficiently sensitive markers of kidney

14   function, substantial kidney injury can occur before it is measurable. As a result, the detection of

15   TDF-induced nephrotoxicity often comes too late, resulting in kidney injury that may be irreversible.

16   Gilead should have warned doctors to test all patients for additional markers of kidney function, such

17   as serum phosphorus and/or urine glucose.[64]

18       226.    Phosphorus is a mineral that plays an important role in many physiologic systems,

19   including keeping bones healthy and strong. Normal working kidneys maintain balanced levels of

20

21       [62] Gilead did not add similar warnings to the Truvada and Atripla labels until 2008. Complera's
22   label included such a warning at the time of FDA approval in 2011. And when Gilead began
     marketing Stribild in 2012, it warned doctors to assess some measures of kidney function in all
23   patients but failed to warn doctors to monitor all patients for serum phosphorus. These warnings
     remained inadequate.
24       [63] It was not until 2018 that Gilead strengthened the Truvada, Atripla, and Complera labels to
     recommend that all patients receive monitoring for serum creatinine, estimated creatinine clearance,
25   urine glucose, and urine protein. Gilead has not made this change to the Viread label.
         [64] The "all patients" monitoring recommendation for Stribild upon approval was inadequate
26   because it failed to warn doctors to measure serum phosphorus. On August 30, 2017, Gilead
     strengthened the Stribild label to recommend that all patients be monitored for serum creatinine,
27   serum phosphorus, estimated creatinine clearance, urine glucose, and urine protein. But, on August
     8, 2018, Gilead again weakened the Stribild label to warn doctors to monitor serum phosphorus only
28   in patients with chronic kidney disease.

phosphorus in the blood. Low levels of phosphorus in the blood are indicative of impaired kidney function. Moreover, low serum phosphate is itself dangerous; low levels of phosphorus in the blood can cause a range of health problems, including serious bone and heart damage.

227.    Serum phosphorus is a more sensitive marker of nephron tubule function than creatinine clearance. This is because the nephron tubule is responsible for reabsorbing phosphorus from the glomerular filtrate. When the nephron tubule is damaged, it cannot reabsorb enough phosphorus, allowing the phosphorus to be excreted via urine. By monitoring patients' serum phosphorus, doctors are able to pick up more subtle changes in kidney function that would otherwise go undetected. Moreover, a possible mechanism for TDF-induced bone injuries is related to the wasting of minerals through the urine. This is due to dysfunction in the nephron tubule, which prevents reabsorption of minerals from the glomerular filtrate. If patients knew earlier that their kidneys were dysfunctional, subsequent bone injuries could be avoided.

228.    By failing to warn doctors to monitor additional markers of all patients' kidney function, Gilead delayed the diagnosis of TDF-associated harm, causing or enhancing patients' injuries that would have been prevented or lessened through early detection.

229.    Gilead's "all patients" monitoring recommendation for its TDF Drugs also remains inadequate because it fails to instruct doctors how frequently doctors should assess patients' kidney function. By the time a doctor assesses a patient's kidney function when "clinically appropriate," the patient is likely to have already experienced adverse toxic effects, some of which might be irreversible. Regularly scheduled, frequent monitoring of kidney function is necessary to catch early signs of TDF-induced toxicity and prevent injury because patients are generally asymptomatic during the early stages.

230.    Moreover, after May 21, 2007, the TDF labels do not disclose that adverse kidney and bone events occurred in patients without pre-existing risk factors—which, combined with the warning to only routinely monitor patients at risk—gives the false impression that TDF is only harmful to people otherwise at risk for kidney and bone injuries. By failing to warn doctors as to the frequency of monitoring, Gilead delayed the diagnosis of TDF-associated harm, causing or enhancing injuries that could have been prevented or lessened through early detection.

231. Gilead's monitoring instructions for at risk patients taking Viread, Truvada, Atripla, and Complera, and patients taking Stribild are also inadequate because they fail to recommend a specific, frequent monitoring schedule for doctors to assess patients' kidney function.

232. Gilead's warnings about the need to monitor patients for the renal effects of TDF in the U.S. are far weaker than those given by Gilead to physicians and patients in the European Union. From the approval of the first TDF product in the EU, Gilead's European labeling (known there as the Summary of Product Characteristics or "SmPC") has recommended that doctors in the EU routinely monitor, on a specific schedule, all patients taking TDF Drugs for adverse renal effects. In addition, Gilead's "all patient" monitoring instruction in the EU is not limited to testing only for creatinine clearance. In its EU labeling, Gilead recommends that doctors also monitor all TDF Drug patients' serum phosphorus levels on the specified, frequent schedule.

233. Viread's initial 2002 SmPC states that: "The monitoring of renal function (serum creatinine and serum phosphate) is recommended at baseline before taking tenofovir disoproxil fumarate and at routine intervals during therapy every four weeks."

234. In 2004, Gilead updated its Viread SmPC to change the recommended monitoring schedule for patients without pre-existing risk factors for renal events to before taking TDF, every four weeks during the first year of treatment, and then every three months thereafter. Gilead instructed doctors to give consideration to more frequent monitoring of renal function for patients at risk for, or with a history of, renal dysfunction and those with renal insufficiency.

235. Gilead recommends in Viread's most current SmPC "that renal function (creatinine clearance and serum phosphate) is assessed in all patients prior to initiating therapy with tenofovir disoproxil fumarate and that it is also monitored after two to four weeks of treatment, after three months of treatment, and every three to six months thereafter in patients without renal risk factors." For patients at risk for renal impairment, Gilead states that more frequent monitoring of renal function is required.

236. In 2005, when Truvada was approved for marketing in the EU, Gilead's Truvada SmPC recommended: "Careful monitoring of renal function (serum creatinine and serum phosphate) . . . before taking Truvada, every four weeks during the first year, and then every three months. In

COMPLAINT FOR DAMAGES – 57
Case No.:
010759-11 1090516 V6

patients with a history of renal function or in patients who are at risk for renal dysfunction, consideration should be given to more frequent monitoring of renal function." In Truvada's most recent SmPC, Gilead continues to recommend frequent, routine monitoring for patients without pre-existing risk factors for renal disease: at treatment initiation and then "after two to four weeks of use, after three months of use and every three to six months thereafter." For patients at risk for renal disease, Gilead warns that more frequent monitoring of renal function is required.

237.    In 2006, Gilead issued a "Dear Doctor" letter to physicians in the EU about the importance of frequent, routine monitoring of all TDF patients' renal function. Gilead issued no such letter to doctors in the U.S., though the risk to patients' kidneys was the same.

238.    In 2007, when Atripla was approved for use in the EU, Gilead's Atripla SmPC recommended that creatinine clearance be calculated in all patients prior to initiating therapy and renal function (creatinine clearance and serum phosphate) be monitored every four weeks during the first year and then every three months. For patients at risk, Gilead stated that consideration must be given to more frequent monitoring. In Atripla's most recent SmPC, Gilead recommends that creatinine clearance be calculated in all patients prior to initiating therapy and renal function (creatinine clearance and serum phosphate) be monitored after two to four weeks of use, after three months of treatment and every three to six months thereafter in patients without renal risk factors. For patients at risk, Gilead states that more frequent monitoring is required.

239.    In 2011, when Complera (under the trade name Eviplera) was first approved for marketing in the EU, Gilead's SmPC recommended that creatinine clearance be calculated in all patients prior to initiating therapy and renal function (creatinine clearance and serum phosphate) be monitored every four weeks during the first year and then every three months. For patients at risk, Gilead stated that consideration must be given to more frequent monitoring. In Complera's/Eviplera's most recent SmPC, Gilead recommends that creatinine clearance be calculated in all patients prior to initiating therapy and renal function (creatinine clearance and serum phosphate) be monitored after two to four weeks of use, after three months of treatment and every three to six months thereafter in patients without renal risk factors. For patients at risk, Gilead states that more frequent monitoring is required.

240.     Since 2013, when Stribild received approval for marketing in the EU, through today, Gilead's SmPC has recommended that during treatment, doctors monitor all patients' creatinine clearance, serum phosphate, urine glucose, and urine protein every four weeks during the first year of treatment and then every three months during Stribild therapy. For patients at risk, Gilead states that more frequent monitoring is required.

241.     Gilead's SmPCs for its TDF-based products in the EU also contain additional instructions to physicians to increase monitoring when a patient's serum phosphate is less than 1.5 mg/dl or creatinine clearance is less than 50 mL per second, and when to consider treatment interruption or discontinuation in light of the results of frequent monitoring.

242.     Unlike Gilead's U.S. labeling, Gilead's EU labeling for Viread and Truvada also discloses that a higher risk of renal impairment has been reported in patients receiving TDF in combination with cobicistat, and doctors should carefully evaluate whether it is appropriate to prescribe TDF in combination with cobicistat in patients with renal risk factors.

243.     There is no medical, clinical, or scientific basis for the differences between the warnings contained in Gilead's labeling for its TDF-based products in the U.S. and its labeling for the same products in the EU. Gilead knew that it should instruct doctors to monitor all patients for multiple markers of kidney function on a frequent schedule but did not do so in the U.S.

244.     Until 2018, Gilead's warnings about the need to monitor patients for renal effects of Viread, Truvada, Atripla, and Complera were also far weaker than the warnings it gives to monitor patients for renal effects of TAF, even though TAF is far less toxic to kidneys than TDF. Gilead has consistently warned doctors to monitor all patients taking TAF-based drugs for multiple markers of renal function, including urine glucose and urine protein, not just estimated creatinine clearance.

245.     Gilead was more concerned with increasing or maintaining TDF Drug sales in the U.S. by downplaying the safety risk and the need for careful, frequent monitoring of all patients than it was in safeguarding patients from the known risks of TDF toxicity.

246.     Pursuant to the CBE regulations, Gilead could have strengthened the Warnings, Precautions, and Adverse Events sections of its labels for its FDA-approved TDF-based drugs unilaterally, without requiring prior FDA approval.

247.     To the extent the 2008 regulations requiring "newly acquired information" apply, Gilead could have strengthened the Warnings and Precautions sections of its labels unilaterally, without requiring prior FDA approval, based on increasing post-approval marketing evidence that patients with and without prior risk factors were experiencing kidney and bone adverse effects, expanding support within the scientific community to frequently monitor multiple indicators of renal function in all patients in light of these adverse effects, and the medical and scientific basis for giving stronger warnings in the EU for the TDF Drugs and in the U.S. for TAF-based drugs. The FDA would not have rejected a label change strengthening monitoring recommendations to protect all patients from known risks of TDF-induced kidney and bone adverse effects. Gilead gave stronger warnings in the EU for the exact same products.

248.     Moreover, each time Gilead sought FDA approval for a new TDF Drug, it could have strengthened its label before the drug obtained FDA approval. Gilead bears primary responsibility for its drug labeling. The FDA would not have prevented Gilead from strengthening its monitoring warnings in advance of FDA approval. Upon information and belief, Gilead did not disclose to the FDA that it gave stronger monitoring warnings in the EU for the exact same products nor did it disclose its scientific or medical reasons for doing so.

**2.     Gilead Failed to Adequately Warn Patients about the Risks of TDF.**

249.     Gilead failed to adequately warn patients about the risks of TDF, and the need to routinely monitor all patients taking TDF, in direct-to-consumer advertising and in patient labeling.

250.     Gilead promoted its TDF Drugs directly to patients through direct-to-consumer advertising, including print and online media. Like its sales force's promotion to doctors, Gilead's consumer advertising downplayed the risks of TDF toxicity by, among other things, hiding risk information relative to the benefits of the drugs, and suggesting that kidney and bone adverse events only occurred in, and monitoring was only necessary for, patients with risk factors for such injuries.

251.     For example, a print advertisement for Truvada that appeared in the November 2004 edition of *The Advocate*, the oldest and largest lesbian, gay, bisexual, and transgender magazine in the U.S., stated under the heading "Important Safety Information" that: "If you have had kidney problems or take other medicines that can cause kidney problems, your medical professional should

1    do regular blood tests to check your kidneys." Yet Gilead knew by this time that adverse kidney

2    events were not limited to at risk patients, and thus should have warned doctors and patients about

3    the need for frequent monitoring of all patients.

4         252.    On March 26, 2010, the FDA issued another Warning Letter to Gilead, this time in

5    connection with Gilead's direct-to-consumer print advertising for Truvada. The FDA stated that

6    Gilead's Truvada advertisement was false and misleading because it overstated the efficacy of

7    Truvada and minimized the risks associated with the drug, in violation of the Federal Food, Drug,

8    and Cosmetic Act and FDA implementing regulations. The FDA noted that Truvada is associated

9    with "serious risks" like new onset or worsening renal impairment, including cases of acute renal

10   failure and Fanconi syndrome (renal tubular injury with severe hypophosphatemia), and decreases in

11   bone mineral density, including cases of osteomalacia (associated with proximal renal tubulopathy

12   and which may contribute to fractures). The agency stated that Gilead's Truvada advertising was

13   false or misleading because it failed to present the risks associated with Truvada with a prominence

14   and readability comparable to the statements regarding the drug's benefits.

15        253.    In addition to the reasons set forth in the Warning Letter, the Truvada advertising was

16   also false and misleading because, like the earlier Truvada advertising, it continued to suggest that

17   kidney problems only occurred in, and monitoring was also necessary for, patients that had had

18   kidney problems in the past or took other medications that can cause kidney problems.

19        254.    Upon information and belief, Gilead's other direct-to-consumer advertising for

20   Viread, Truvada, Atripla, and Complera similarly failed to adequately warn patients about the true

21   risk of TDF and the need to routinely monitor all patients for TDF-associated kidney and bone

22   effects.

23        255.    Gilead's patient package inserts for Viread, Truvada, Atripla, and Complera also

24   failed to warn about all patients' need to be routinely monitored by their doctors for adverse kidney

25   and bone effects. The patient package inserts said nothing for years about monitoring anyone other

26   those who were already at risk for kidney and bone problems despite Gilead's knowledge that TDF

27   was injuring patients without identified risk factors for such injuries.

28

256. Gilead's patient package inserts for Viread, Truvada, Atripla, and Complera failed to adequately warn patients even after Gilead had inadequately updated the warnings in its prescriber labeling.

257. For example, Gilead did not disclose to patients that Viread may cause "new or worse kidney problems" until more than two years after Gilead added that warning to the Viread prescriber labeling. And Gilead waited many more years before it added the "new or worse kidney problems" disclosure to the patient package inserts for other TDF products; it did not appear in the Truvada patient package insert until June 17, 2013 and did not appear in the Atripla patient package insert until July 25, 2018—nearly five and ten years respectively after Gilead first warned doctors that TDF may cause "new onset or worsening renal impairment."

258. Gilead similarly delayed disclosing to patients in the patient package inserts about doctors' need to assess all patients' kidney function prior to initiating treatment with TDF. Although Gilead added that warning to the Viread prescriber labeling in May 2007, it did not tell patients that "[y]our healthcare provider should do blood tests to check your kidneys before you start treatment" with TDF until August 16, 2012 for Viread, May 15, 2018 for Truvada, July 25, 2018 for Atripla, and January 25, 2013 for Complera. At a minimum, Gilead was grossly negligent in failing to ensure that its warnings to patients were consistent with those it gave to doctors and the patient warnings it gave were consistent among its various TDF Drugs.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

259. Gilead misrepresented that TAF was "new" despite knowing that it had discovered the benefits of TAF even before Viread was approved in 2001.

260. Gilead misrepresented the reasons that it shelved TAF in 2004, asserting that TAF could not be differentiated from TDF when it knew that TAF was, in fact, highly differentiated from TDF.

261. Gilead concealed that it shelved TAF in 2004 in order to extend the lifecycle of its HIV product portfolio while patients were injured by TDF-induced kidney and bone toxicity.

262.     Gilead misrepresented that it renewed development of TAF because of the needs of an aging HIV population. Gilead knew by 2004 when it halted TAF development that, as a result of cART, many HIV patients had a normal life expectancy.

263.     For years, Gilead has publicized the pretext for its decision to halt and then renew TAF development in order to conceal the existence of Plaintiffs' claims.

264.     Gilead concealed that it did not reduce the dose of TDF in Stribild even though it knew to reduce the tenofovir prodrug dose when combined with cobicistat.

265.     Gilead concealed the true risk of kidney and bone injuries TDF posed to patients who did not have pre-existing risk factors for such injuries and concealed from U.S. doctors and patients what it knew about the need to monitor all patients for TDF associated toxicity.

266.     Because of Gilead's misrepresentations and omissions, Plaintiffs did not know and had no reason to suspect that Gilead's wrongdoing was the cause of their injuries and could not have discovered their claims.

267.     No reasonable person taking TDF-based drugs and experiencing kidney and bone toxicities would have suspected that Gilead purposefully withheld a safer design that would have ameliorated those very side effects.

268.     No reasonable person without prior risk factors for renal or bone harm taking TDF-based drugs and experiencing kidney and bone toxicities would have suspected that Gilead failed to adequately warn them because the label misleadingly suggests that only patients with pre-existing risk factors were in danger.

269.     No reasonable person would have suspected that Gilead provided stronger warnings to patients and doctors in the EU than it did in the U.S. for the exact same TDF products.

270.     Gilead's misrepresentations and omissions would lead a reasonable person to believe that he or she did not have a claim for relief.

271.     Because of Gilead's misrepresentations and omissions, neither Plaintiffs nor any reasonable person would have had reason to conduct an investigation. Once Plaintiffs suspected that Gilead's wrongdoing was the cause of their injuries, they were diligent in trying to uncover the facts.

272.     Gilead's misrepresentations and omissions regarding its refusal to earlier market TAF-designed products and the true risks of TDF constitute continuing wrongs that continue to this day.

### VII.    CLAIMS FOR RELIEF[65]

### COUNT I

**STRICT PRODUCTS LIABILITY – DESIGN DEFECT**
**UNDER THE LAWS OF THE STATES OF ALABAMA,[66] COLORADO, FLORIDA, GEORGIA, ILLINOIS, MARYLAND, MINNESOTA, NEW YORK, AND TENNESSEE**

273.     Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

274.     Gilead is the manufacturer and seller of the TDF Drugs.

275.     The TDF Drugs reached Plaintiffs without substantial change to the condition in which they were sold.

276.     The TDF Drugs are unreasonably dangerous and unsafe for their intended purpose because they include TDF, which causes kidney and bone toxicity, as the design for delivering tenofovir to the body. The design defect existed in these products at the time they left Gilead's possession.

277.     Stribild is also unreasonably dangerous and unsafe for its intended purpose because it combines 300 mg TDF with cobicistat, which enhances TDF toxicity. The design defects existed in Stribild at the time it left Gilead's possession.

278.     The TDF Drugs are not as safe as current technology could make them, nor were they as safe as then-current technology could make them when Gilead first manufactured and distributed each of the TDF Drugs.

279.     The TDF Drugs were not incapable of being made safe at the time of manufacture and distribution. Gilead knew, before it manufactured and distributed each of the TDF Drugs, that TAF

---

[65] Plaintiffs assert claims under the laws of the states in which they reside and ingested the relevant TDF Drugs.

[66] The Alabama Plaintiffs assert their claims under the judicially created Alabama Extended Manufacturer's Liability Doctrine ("AEMLD").

1   was more potent than TDF and reduced the risk of kidney and bone toxicity compared to TDF.

2   Gilead also knew that it could reduce the dose of TDF in Stribild and achieve the same antiviral

3   response with less kidney and bone toxicity. The TDF Drugs are therefore not unavoidably unsafe.

4   280.   The risks of patient harm associated with TDF-induced kidney and bone toxicity were

5   both known to and foreseeable to Gilead.

6   281.   Gilead could have reduced or prevented the foreseeable harm and risks of harm to

7   Plaintiffs associated with TDF by adopting a reasonable and feasible alternative design. Gilead could

8   have incorporated the safer TAF design, which it knew reduces the risks of kidney and bone toxicity

9   and is safer than TDF, into the TDF Drugs before they were approved by the FDA. Gilead did utilize

10  the TAF design instead of TDF in other FDA-approved products that are identical to the TDF Drugs

11  except for the substitution of TAF for TDF. Gilead markets its TAF-designed products as safer than

12  the TDF Drugs and advocates that doctors switch their patients from a TAF-designed to a TDF-

13  designed product because of TAF's superior safety profile with respect to kidney and bone toxicity.

14  282.   A drug product containing TAF could have and would have been FDA approved and

15  on the market years earlier—far earlier than Stribild's FDA approval—if Gilead had not purposefully

16  shelved the TAF design for approximately six years in order to make more money.

17  283.   Gilead could have reduced or prevented the foreseeable harm and risks of harm to

18  Plaintiffs associated with Stribild by adopting another reasonable and feasible alternative design.

19  Gilead could have reduced the dose of TDF in Stribild before it was approved by the FDA because,

20  as it knew for years, tenofovir concentrations rise significantly when tenofovir is combined with a

21  boosting agent like cobicistat. The reasonableness and feasibility of this alternative design is

22  demonstrated by, *inter alia*, the fact that Gilead reduced the dose of the tenofovir prodrug TAF in

23  Genvoya, which is identical to Stribild except for the substitution of TAF for TDF. The FDA could

24  have and would have approved this alternative design had Gilead submitted it for approval.

25  284.   The likelihood and severity of the kidney and bone injuries suffered by patients like

26  Plaintiffs far outweighed Gilead's burden in taking safety measures to reduce or avoid the harm.

27  Given the sheer number of people taking the TDF Drugs, including over the long-term, there was a

28  high likelihood that TDF would injure a very large number of patients, and that a significant number

of those injuries would be irreversible. Gilead's burden was small. Gilead had already discovered the safer TAF method of introducing tenofovir into the body before it sought FDA approval for each of the TDF Drugs and using the TAF design would have no adverse impact on the utility of the products.

285.    TAF-based alternative designs, and a reduced TDF dose design of Stribild, would have accomplished the product's purpose at lesser risk. This is how Gilead markets its TAF-designed products today—as equally or more effective than the TDF Drugs with a reduced risk of kidney and bone toxicity.

286.    Gilead knew that ordinary patients would use the TDF Drugs without knowledge of the hazards involved in such use. The TDF Drugs failed to perform as an ordinary consumer would expect.

287.    Gilead knowingly designed its TDF Drugs with TDF rather than safer TAF to maximize profits on its portfolio of TDF profits and extend the lifecycle of its HIV franchise, which formed the backbone of Gilead's operations. Gilead withheld its safer TAF design to make more money at the expense of patients' health.

288.    The benefit in promoting enhanced accountability through strict products liability outweighs the benefit of a product that Gilead should have and could have made safer years earlier.

289.    Plaintiffs ingested one or more of the TDF Drugs for an approved purpose and experienced bone and/or kidney injuries while taking TDF.

290.    Plaintiffs' bone and kidney toxicity-related injuries were directly and proximately caused by TDF while Plaintiffs used the TDF Drugs in a reasonably foreseeable manner.

## COUNT II

### STRICT PRODUCTS LIABILITY – FAILURE TO WARN
### UNDER THE LAWS OF THE STATES OF ALABAMA, COLORADO, FLORIDA, GEORGIA, ILLINOIS, MARYLAND, MINNESOTA, NEW YORK, AND TENNESSEE

291.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

292.    Gilead is the manufacturer and seller of the TDF Drugs.

293.    Gilead was aware of the risks TDF posed to patients' kidneys and bones, and the risks TDF posed to patients' kidneys and bones were knowable, at the time Gilead manufactured, sold, or distributed the TDF Drugs.

294.    The risks TDF posed to patients' kidneys and bones were known or knowable in light of the scientific and medical knowledge available at the time of manufacture and distribution.

295.    The need to frequently monitor all TDF patients for kidney toxicity using more than one marker of kidney function to ensure the safe use of TDF was known or knowable in light of the scientific and medical knowledge available at the time of manufacture and distribution of the TDF Drugs.

296.    TDF posed a substantial danger to patients' kidneys and bones.

297.    Ordinary consumers and physicians would not have recognized the potential risks TDF posed to patients' kidneys and bones.

298.    Gilead failed to adequately warn Plaintiffs and Plaintiffs' physicians about the risks TDF posed to patients' kidneys and bones, and the proper and safe use of the TDF Drugs.

299.    The inadequate warnings and instructions Gilead did provide were minimized, eroded, and nullified by Gilead's improper promotion of the TDF Drugs to doctors.

300.    Gilead failed to adequately warn Plaintiffs and Plaintiffs' physicians that all TDF patients needed to be monitored frequently, on a specific schedule, for TDF-associated toxicity.

301.    Gilead failed to adequately warn Plaintiffs and Plaintiffs' physicians that all TDF patients' kidney function needs to be monitored by measuring more than one insufficient marker of kidney function.

302.    Plaintiffs were injured by using TDF in a reasonably foreseeable way.

303.    The lack of adequate warnings and instructions was a substantial factor in causing Plaintiffs' injuries.

304.    Had Gilead adequately warned and instructed Plaintiffs, Plaintiffs would have taken the TDF Drugs in a safer way.

305.    Had Gilead adequately warned and instructed Plaintiffs' doctors, Plaintiffs' doctors would have read and heeded such adequate warnings and instructions.

306.     Plaintiffs' properly warned physicians would have monitored Plaintiffs more frequently and more effectively. As a result, Plaintiffs' properly warned physicians would have detected TDF toxicity earlier, thus preventing or lessening Plaintiffs' injuries.

307.     Plaintiffs' bone and kidney toxicity-related injuries were directly and proximately caused by Gilead's inadequate warnings.

## COUNT III

### LOUISIANA PRODUCTS LIABILITY ACT, LA. R.S. §§ 9:2800.51 *ET SEQ.*

308.     Louisiana Plaintiffs reallege and incorporate the allegations made above as if fully set forth below, including but not limited to the allegations specifically contained in the paragraphs corresponding to Counts I and II above.

309.     The TDF Drugs are unreasonably dangerous in design because, at the time they left Gilead's control, there existed alternative designs for the products that were capable of preventing Plaintiffs' injuries, and the likelihood that the products' design would cause Plaintiffs' damage and the gravity of that damage outweighed Gilead's burden in adopting the alternative designs. There is no adverse effect of using the alternative designs on the utility of the product.

310.     At the time the TDF Drugs left Gilead's control, Gilead knew and in light of then-existing reasonably available scientific and technical knowledge should have known of the design characteristic that caused the damage or the danger of such characteristic.

311.     At the time the TDF Drugs left Gilead's control, Gilead knew and in light of then-existing reasonably available scientific and technical knowledge should have known of the alternative designs.

312.     The TDF Drugs are unreasonably dangerous due to the lack of an adequate warning. At the time the TDF Drugs left Gilead's control, and after the TDF Drugs left Gilead's control, the TDF Drugs possessed a characteristic that may cause damage and Gilead failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users of the products. The TDF Drugs are dangerous to an extent beyond which would be contemplated by the ordinary user, with ordinary knowledge common to the community as to the product's characteristics.

313.    The defective and unreasonably dangerous condition of the TDF Drugs proximately caused Louisiana Plaintiffs' injuries and damages for which recovery is sought.

**COUNT IV**

**NEGLIGENCE AND GROSS NEGLIGENCE**
**UNDER THE LAWS OF THE STATES OF ALABAMA, COLORADO, FLORIDA, GEORGIA, ILLINOIS, MARYLAND, MINNESOTA, NEW YORK, AND TENNESSEE**

314.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

315.    Gilead has a duty to exercise ordinary care in the design, manufacture, marketing, and sale of its pharmaceutical products, including the TDF Drugs.

316.    Gilead has a duty to refrain from selling unreasonably dangerous products, including the duty to ensure that its pharmaceutical products do not cause patients to suffer from foreseeable risks of harm.

317.    Gilead has a duty to monitor the adverse effects associated with its pharmaceutical products, including the TDF Drugs.

318.    Gilead has a continuing duty to warn of the adverse effects associated with its pharmaceutical products, including the TDF Drugs, to avoid reasonably foreseeable risks.

319.    Gilead has a duty to identify any laboratory tests helpful in identifying adverse reactions and the recommended frequency with which such tests should be performed.

320.    Gilead has a duty to exercise reasonable care when it undertakes affirmative acts for the protection of others.

321.    Gilead owes these duties to Plaintiffs because it was foreseeable to Gilead that patients like Plaintiffs would ingest and consequently be endangered by its TDF Drugs.

322.    Gilead knew that the TDF design it incorporated into the TDF Drugs was associated with risks of kidney and bone toxicity and caused injuries that resulted from kidney and bone toxicity – including in patients not otherwise at risk for such injuries. Gilead's knowledge that TDF harmed patients' kidneys and bones only grew with each year TDF was on the market. By the time Stribild entered the market, Gilead had more than a decade's worth of knowledge that TDF was toxic to kidneys and bones.

323.    Gilead knew that combining 300 mg of TDF with cobicistat resulted in even greater toxicity, and that it could reduce the tenofovir prodrug dose when combined with cobicistat and achieve the same therapeutic effects. Despite this knowledge, Gilead did not reduce the TDF dose in Stribild.

324.    Gilead knew, before its first TDF Drug and every subsequent TDF Drug was approved by the FDA, that TAF is safer than TDF in that it reduces the risks of kidney and bone toxicities associated with TDF. Despite knowing that TAF would reduce foreseeable harm to patients' kidneys and bones, Gilead repeatedly incorporated the TDF design into the TDF Drugs prior to FDA approval and prevented patients from taking a safer TAF-based product so Gilead could make more money.

325.    Based, *inter alia*, on its duty to monitor the adverse effects associated with Viread, Truvada, Atripla, Complera, and Stribild, Gilead knew that the likelihood and severity of the harm associated with TDF was great. Thousands of patients experienced damage to their kidneys and bones as a result of TDF exposure—some of it severe and irreversible. The likelihood and severity of the kidney and bone injuries suffered by patients like Plaintiffs far outweighed Gilead's burden in taking safety measures to reduce or avoid the harm. Gilead had already designed the safer TAF method of introducing tenofovir into the body before it sought FDA approval for the TDF Drugs. Gilead had also reduced the TAF dose when combined with cobicistat in Genvoya, when it was developing Stribild.

326.    Gilead failed to exercise ordinary care in the design, manufacture, and sale of the TDF Drugs.

327.    Gilead failed to use the amount of care in designing the TDF Drugs that a reasonably careful manufacturer would have used to avoid exposing patients to foreseeable risks of harm.

328.    Gilead undertook to develop and market a safer TAF-designed product to sell to wholesalers and other direct purchasers of pharmaceuticals. Gilead recognized that its development and marketing of safer TAF-designed products was for the protection of patients like Plaintiffs. By shelving the safer TAF design purely for monetary gain and misrepresenting why it was abandoning the safer TAF design, Gilead failed to exercise reasonable care in the performance of this

1    undertaking that increased the risk of harm to patients like Plaintiffs. Gilead's failure to exercise

2    reasonable care resulted in physical harm to Plaintiffs.

3         329.    Gilead failed to use the amount of care in warning about the risks and safe use of the

4    TDF Drugs that a reasonably careful manufacturer would have used to avoid exposing patients to

5    foreseeable risks of harm.

6         330.    Gilead knew or reasonably should have known that the TDF Drugs were dangerous or

7    likely to be dangerous when used in a reasonably foreseeable manner.

8         331.    Gilead knew or reasonably should have known that Plaintiffs and Plaintiffs'

9    physicians would not realize the danger posed by inadequate monitoring of patients taking TDF

10   Drugs.

11        332.    Gilead failed to adequately warn Plaintiffs and Plaintiffs' physicians about the need to

12   monitor all patients taking the TDF Drugs. For years, Gilead failed to recommend that doctors

13   monitor anyone other than patients "at risk" for TDF-induced kidney and/or bone injuries. When

14   Gilead finally added a weak instruction regarding the monitoring of all patients for kidney damage, it

15   only warned doctors to monitor patients for one insufficient marker of kidney dysfunction that was

16   incapable of detecting many dangerous changes in kidney dysfunction, and failed to warn doctors to

17   monitor TDF patients on a frequent schedule. Gilead's monitoring warnings with respect to "at risk"

18   Viread, Truvada, Atripla, and Complera users and Stribild users were also inadequate because they

19   failed to warn doctors to monitor patients on a specific, frequent schedule.

20        333.    A reasonable manufacturer and seller under the same or similar circumstances would

21   have instructed Plaintiffs and Plaintiffs' physicians on the safe use of the TDF Drugs, i.e., use where

22   doctors frequently monitored all TDF patients for TDF-associated toxicity, including monitoring for

23   kidney damage using more than one inadequate test. Gilead knew to warn doctors to frequently

24   monitor all patients for kidney damage using more than one inadequate test because it did so in the

25   European Union.

26        334.    Gilead's failure to adequately warn Plaintiffs and Plaintiffs' doctors about the need to

27   monitor TDF Drug patients was compounded by Gilead's misrepresentations to doctors during sales

28

1   detailing and other promotional activities. Gilead's promotion of the TDF Drugs undermined the

2   efficacy of its existing (inadequate) warnings.

3          335.    Plaintiffs were injured by using TDF in a reasonably foreseeable way.

4          336.    The lack of adequate warnings was a substantial factor in causing Plaintiffs' injuries.

5          337.    Had Gilead adequately warned Plaintiffs' doctors, Plaintiffs' doctors would have read

6   and heeded such adequate warnings.

7          338.    Plaintiffs' properly warned physicians would have monitored Plaintiffs more

8   frequently and effectively. As a result, Plaintiffs' properly warned physicians would have detected

9   TDF toxicity earlier, thus preventing or lessening Plaintiffs' injuries.

10          339.    Plaintiffs were injured as a direct and proximate result of Gilead's negligence.

11          340.    Gilead's conduct constitutes gross negligence and willful misconduct.

12          341.    By designing the TDF Drugs to contain TDF when it knew TDF harmed patients'

13   kidneys and bones, and intentionally withholding the safer TAF design from patients, while failing to

14   adequately warn of the known risks and safe use of TDF, Gilead acted in reckless disregard of, or

15   with a lack of substantial concern for, the rights of others. By designing Stribild to contain 300 mg

16   TDF when it knew to reduce the tenofovir prodrug dose with combined with cobicistat, Gilead acted

17   in reckless disregard of, or with a lack of substantial concern for, the rights of others.

18          342.    Gilead intentionally designed the TDF Drugs to contain 300 mg TDF and withheld

19   the safer designs from patients while in disregard of the known risk of TDF-induced kidney and/or

20   bone toxicity, making it highly probable that harm would result.

21          343.    Gilead knew that its conduct would harm patients like Plaintiffs but Gilead withheld

22   its safer designs to make more money.

23                                              **COUNT V**

24                                        **FRAUD BY OMISSION**
25   **UNDER THE LAWS OF THE STATES OF ALABAMA, COLORADO, FLORIDA,**
     **GEORGIA, ILLINOIS, MARYLAND, MINNESOTA, NEW YORK, AND TENNESSEE**

26          344.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth

27   below.

28

COMPLAINT FOR DAMAGES – 72
Case No.:
010759-11 1090516 V6

345.    Gilead has a duty to exercise ordinary care in the design, manufacture, marketing, and sale of its pharmaceutical products, including the TDF Drugs.

346.    Gilead has a duty to refrain from selling unreasonably dangerous products, including the duty to ensure that its pharmaceutical products do not cause patients to suffer from foreseeable risks of harm.

347.    Gilead has a duty to monitor the adverse effects associated with pharmaceutical products, including Stribild.

348.    Gilead has a duty to exercise reasonable care when it undertakes affirmative acts for the protection of others.

349.    Gilead owes these duties to Plaintiffs because it was foreseeable to Gilead that patients like Plaintiffs would ingest and consequently be endangered by the TDF Drugs.

350.    Gilead also owed a duty to speak because it was in possession of information about TDF and TAF that was not readily available to Plaintiffs and Plaintiffs' physicians, made partial representations about TDF and TAF to Plaintiffs and Plaintiffs' physicians while suppressing material facts, and actively concealed material information about TDF and TAF from Plaintiffs and Plaintiffs' physicians, including that: (a) Gilead knew about the safer TAF design for delivering tenofovir into the body prior to seeking and receiving FDA approval for the TDF Drugs but designed the TDF Drugs to include TDF anyway, even though it knew that TDF posed a significant and increased safety risk to patients' kidneys and bones; (b) the toxicity associated with tenofovir was not unavoidable; (c) the real reason Gilead abandoned its TAF design in 2004 was not because TAF could not be sufficiently differentiated from TDF; (d) Gilead had already determined that it should reduce the dose of tenofovir prodrug when combining it with cobicistat at the time it was developing Stribild but Gilead did not reduce the TDF dose in Stribild as it did with Genvoya; (e) Gilead purposefully withheld the TAF design, which it knew was safer than TDF, solely to make more money; and (f) Gilead knew to warn doctors to frequently monitor all patients for the adverse effects of TDF toxicity using more than one insufficient marker of kidney function even though it did not do so in its warnings to doctors in the U.S.

351.    Gilead knew that this information was not readily available to Plaintiffs and their doctors, and Plaintiffs and their doctors did not have an equal opportunity to discover the truth. Plaintiffs and their doctors had no practicable way of discovering the true state and timing of Gilead's knowledge.

352.    Gilead intentionally omitted from its prescriber and patient labeling an adequate warning regarding the need for doctors to monitor all TDF patients, on a frequent, specific schedule, for the adverse effects of TDF-associated bone and kidney toxicity. Gilead intentionally omitted an adequate monitoring warning in order to conceal the true risk of its TDF-based antiviral products, and to inflate sales by inducing doctors to prescribe, and patients like Plaintiffs to consume, its TDF Drugs. By providing inadequate warnings that were contrary to those it gave with respect to the exact same drugs in the EU, Gilead partially disclosed material facts. Gilead had a duty of complete disclosure once it began to speak.

353.    Plaintiffs and their doctors justifiably relied on Gilead's product labeling and other representations.

354.    Had Gilead not omitted this information about the safe use of its drugs from the prescriber and patient labeling, doctors would have performed, and patients would have insisted upon, frequent and adequate monitoring for the kidney and bone problems that have injured Plaintiffs. But for Gilead's omissions, Plaintiffs would have consumed the TDF Drugs in a safer way.

355.    If Plaintiffs had been adequately monitored for kidney and bone problems while taking TDF, they would not have been injured or their injuries would have been less severe.

356.    Gilead intentionally concealed from Plaintiffs and their doctors the fact that Gilead had already developed the safer TAF mechanism but designed the TDF Drugs to contain TDF instead of the safer TAF design in order to maximize profits on its TDF-based products and extend its ability to profit on its HIV franchise for years to come. Gilead actively concealed these material facts by, *inter alia*, misrepresenting: (a) that any tenofovir-induced toxicity was rare and unavoidable; (b) why Gilead had purportedly abandoned development of TAF in 2004; and (c) that TAF was "new" once Gilead finally introduced the safer TAF design over a decade later.

357.     Gilead also intentionally concealed from Plaintiffs and their doctors that Gilead knew that the tenofovir prodrug dose should be reduced when combined in a fixed dose combination pill with cobicistat, but did not reduce the TDF dose in Stribild as it did with Genvoya.

358.     By concealing that Gilead was aware of but had withheld the safer designs, Gilead intended to and did induce Plaintiffs' doctors to prescribe, and Plaintiffs to ingest, one or more of the TDF Drugs, thereby causing Plaintiffs' injuries.

359.     Plaintiffs and their doctors justifiably relied on Gilead's omissions regarding TAF.

360.     Had Gilead disclosed that it was aware of, but intentionally withheld, the safer TAF mechanism for delivering tenofovir into the body, Plaintiffs would have ingested TDF in a safer manner.

361.     Plaintiffs' doctors would have ensured that Plaintiffs ingested TDF in a safer manner through increased and/or more careful monitoring for TDF-induced kidney and bone toxicity, or by prescribing TDF without coadministration with cobicistat.

362.     Plaintiffs were injured as a direct and proximate result of Gilead's material omissions.

## COUNT VI

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE LAWS OF THE STATES OF ALABAMA, COLORADO, ILLINOIS, MARYLAND, MINNESOTA, NEW YORK, AND TENNESSEE**

363.     Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

364.     Gilead is the manufacturer and seller of the TDF Drugs.

365.     An implied warranty of fitness for human consumption runs from Gilead to consumers like Plaintiffs.

366.     Gilead impliedly warranted to Plaintiffs and their doctors that the TDF Drugs were of merchantable quality, and fit and safe for the use for which they were intended.

367.     Plaintiffs ingested the TDF Drugs for the treatment of HIV, Hepatitis B, or PrEP, which is the purpose for which the drugs were manufactured, sold, and prescribed.

368.     Plaintiffs relied on Gilead's skill or judgment to provide a product suitable for this purpose. Gilead is in the business of designing, manufacturing, selling, and marketing prescription drugs and specializes in drugs for the treatment or prevention of HIV, and treatment of Hepatitis B.

369.     Gilead had reason to know that Plaintiffs and their doctors would rely on Gilead's skill or judgment.

370.     The TDF Drugs are unfit for the purpose for which they were purchased because they are toxic to patients' kidneys and bones when put to their intended and ordinary use, causing injuries to Plaintiffs.

371.     The dangers the TDF Drugs posed to Plaintiffs' kidneys and bones were known and knowable to Gilead at the time of manufacture and sale. Yet Gilead marketed the TDF Drugs without adequate warnings about the risks or safe use of TDF of which it knew or should have known.

372.     Plaintiffs suffered kidney and/or bone injuries as a result of ingesting the TDF Drugs.

373.     In addition to the common law, the conduct alleged herein constitutes a breach of the implied warranty of merchantability under the Uniform Commercial Code as codified by the following statutes:

        a.     Alabama, Code of Alabama § 7-2-314

        b.     Colorado, Colorado R.S. 4-2-314

        c.     Illinois, 810 ILCS 5/2-314

        d.     Maryland, Md. Comm. Law Code Ann. § 2-314

        e.     Minnesota, Minn. Stat. Ann. § 336.2-314

        f.     New York, N.Y. U.C.C. § 2-314

        g.     Tennessee, Tenn. Code Ann. § 47-2-314

374.     On January 24, 2019, Plaintiffs sent a letter to Gilead via certified mail giving official notice of Gilead's breach of the implied warranty of merchantability. Plaintiffs' notice letter is attached as Exhibit A.

1

**COUNT VII**

2

**VIOLATION OF STATE CONSUMER PROTECTION LAWS**

3      375.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth

4  below.

5      376.    Plaintiffs are consumers within the meaning of the following states' consumer

6  protection laws because they are natural persons who purchased one or more of the TDF Drugs for

7  personal, family, or household use.

8      377.    The TDF Drugs are goods and merchandise within the meaning of the following

9  states' consumer protection laws.

10     378.    Gilead manufactured, sold, and marketed its TDF Drugs in trade or commerce,

11  including within each of the 50 U.S. States.

12     379.    Gilead engaged in unconscionable, unfair, false, fraudulent, misleading, and deceptive

13  acts and practices in connection trade or commerce involving its TDF Drugs.

14     380.    Gilead intentionally suppressed, concealed, and omitted material facts in its

15  promotional, marketing, and labeling communications about the risks and benefits of the TDF Drugs

16  to Plaintiffs and Plaintiffs' doctors, including but not limited to, that: 1) all TDF patients should be

17  carefully and frequently monitored for adverse kidney and bone effects on a frequent schedule; 2)

18  Gilead had already developed the safer TAF design for delivering tenofovir into the body but

19  nevertheless designed the TDF Drugs to contain TDF, and withheld the safer SAF design, in order to

20  maximize profits on its TDF-based products and extend its ability to profit on its HIV franchise for

21  years to come; and 3) Gilead knew that the tenofovir prodrug dose should be reduced when

22  combined in a fixed dose combination pill with cobicistat, but did not reduce the TDF dose in

23  Stribild.

24     381.    Gilead intentionally misrepresented material facts in its promotional, marketing, and

25  labeling communications about the risks and benefits of the TDF Drugs to Plaintiffs and Plaintiffs'

26  doctors, including but not limited to, that the TDF Drugs: 1) presented limited risk of kidney and

27  bone toxicity resulting from purportedly unavoidable side effects of tenofovir; and 2) did not require

28  careful, frequent monitoring of all TDF Drug patients for TDF-associated kidney and bone toxicity.

COMPLAINT FOR DAMAGES – 77
Case No.:
010759-11 1090516 V6

382.    Gilead's conduct significantly impacted the public as actual or potential consumers of Gilead's TDF Drugs. Hundreds of thousands of consumers in the U.S. have ingested one or more of the TDF Drugs and Gilead has directed its misleading marketing and promotional messages to the market generally. Consumers like Plaintiffs are at an informational disadvantage and lack bargaining power relative to Gilead. Gilead's conduct has previously impacted other consumers and has significant potential to do so in the future.

383.    Gilead's conduct was likely to mislead and did mislead reasonable consumers and members of the public.

384.    Gilead's misrepresentations and omissions were material and affected Plaintiffs' and Plaintiffs' doctors' conduct.

385.    Gilead intended that others rely on its deceptive and misleading omissions and misrepresentations regarding its TDF Drugs.

386.    Plaintiffs and their doctors reasonably relied on Gilead's deceptive and misleading omissions and misrepresentations regarding its TDF Drugs.

387.    Plaintiffs' doctors prescribed, and Plaintiffs ingested, one or more of the TDF Drugs in reliance on Gilead's unconscionable, false, misleading and/or deceptive acts, misrepresentations, and omissions.

388.    Plaintiffs were directly and proximately injured as a result of Gilead's deceptive conduct. But for Gilead's omissions and misrepresentations, Plaintiffs would have ingested the TDF Drugs in a safer way—through better monitoring and/or by not taking Stribild (TDF in combination with cobicistat) —thus preventing or reducing Plaintiffs' injuries and monetary expenses in connection therewith.

389.    Plaintiffs suffered ascertainable losses as a result of Gilead's violations of the state consumer protection statutes alleged herein. Plaintiffs will prove the full extent and amount of their damages at trial.

390.    The conduct alleged herein violates the state consumer protection statutes as further alleged below.

1

### a.    Alabama, Ala. Code §§ 8-19-1, *et seq.*

2          391.    Alabama Plaintiffs intend to assert a claim under the Alabama Deceptive Trade

3    Practices Act, alleging that Gilead committed unconscionable, false, misleading and/or deceptive

4    acts and practices in the conduct of trade or commerce in violation of Ala. Code § 8-19-5(27), and

5    violated Ala. Code § 8-19-5(5) and (7) by representing that the TDF Drugs have characteristics,

6    benefits, and qualities they do not have, and are of a particular standard and quality when they are

7    another.

8          392.    On January 24, 2019 Alabama Plaintiffs made a written demand for relief in

9    satisfaction of the Act and will amend this Complaint to add claims under the Act once the required

10   notice period has elapsed. Plaintiffs' notice letter is attached as Exhibit A.

11         393.    These paragraphs are included for notice purposes only and are not intended to assert

12   a claim under the Alabama Deceptive Trade Practices Act at this time.

13

### b.    Colorado, Colo. Rev. Stat. §§ 6-1-101 *et seq.*

14         394.    Gilead violated Colo. Rev. Stat. §§ 6-1-101 *et seq.* (the "Colorado Consumer

15   Protection Act") by: 1) knowingly making a false representation as to the characteristics or benefits

16   of the TDF Drugs in violation of Colo. Rev. Stat. § 6-1-105(1)(e); and 2) representing that TDF

17   Drugs are of a particular standard or quality when Gilead knew or should have known they are of

18   another in violation of Colo. Rev. Stat. § 6-1-105(1)(g).

19         395.    Gilead's conduct significantly impacted the public as actual or potential consumers of

20   Gilead's TDF Drugs. Millions of consumers have ingested one or more of the TDF Drugs and Gilead

21   has directed its misleading marketing and promotional messages to the market generally. Consumers

22   like Plaintiffs are at an informational disadvantage and lack bargaining power relative to Gilead.

23   Gilead's conduct has impacted other consumers and has significant potential to do so in the future.

24         396.    Colorado Plaintiffs were injured as a result of Gilead's violations of the Colorado

25   Consumer Protection Act.

26         397.    Colorado Plaintiffs seek actual damages, costs, attorneys' fees, and treble damages

27   arising from Gilead's bad faith (fraudulent, willful, knowing, or intentional) conduct as alleged

28   herein.

COMPLAINT FOR DAMAGES – 79
Case No.:
010759-11 1090516 V6

c.      **Illinois, 815 ILCS 505/1** *et seq.* **and 815 ILCS 510** *et seq.*

398.    Gilead has engaged in the following conduct in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act and Illinois Uniform Deceptive Trade Practices Act: 1) engaging in unfair methods of competition or deceptive acts or practices, including the use of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact in the conduct of trade or commerce in violation of 815 ILCS 505/2; 2) representing that the TDF Drugs have characteristics or benefits that they do not have in violation of 815 ILCS 510/2(a)(5); and 3) representing that the TDF Drugs are of a particular standard, quality or grade when they are of another in violation of 815 ILCS 501/2(a)(7).

399.    Gilead misrepresented and concealed material facts with the intent that others rely on the concealment or misrepresentation of material facts.

400.    Illinois Plaintiffs suffered actual pecuniary losses proximately caused by Gilead's violations of the Illinois Act.

401.    Illinois Plaintiffs seek actual damages, punitive damages, reasonable attorneys' fees, and costs.

d.      **Maryland, Md. Com. Law Code Ann. § 13-101** *et seq.*

402.    Gilead committed the following violations of Md. Com. Law Code Ann. § 13-101 *et seq.*: 1) false and misleading oral or written statements or other representations of any kind which have the capacity, tendency, or effect of deceiving or misleading consumers in violation of Md. Com. Law Code Ann. § 13-301(1); 2) representations that the TDF Drugs have a characteristic or benefit which they do not have in violation of Md. Com. Law Code Ann. § 13-301(2)(i); 3) representations that the TDF Drugs are of a particular standard or quality which they are not in violation of Md. Com. Law Code Ann. § 13-301(2)(iv); 4) failure to state a material fact if the failure deceives or tends to deceive in violation of Md. Com. Law Code Ann. § 13-301(3); and 5) deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the sale of consumer goods in violation of Md. Com. Law Code Ann. § 13-301(9).

403.     Maryland Plaintiffs suffered injuries and losses as a result of Gilead's violations of Md. Com. Law Code Ann. § 13-101 *et seq*.

404.     Maryland Plaintiffs seek actual damages and reasonable attorneys' fees.

**e.      Minnesota, Minn. Stat. §§ 325F.68 *et seq*., §§ 325D.44 *et seq*.**

405.     Gilead's conduct constitutes fraud, false pretense, false promise, misrepresentation, misleading statements, or deceptive practices with the intent that others rely thereon in violation of Minn. Stat. §§ 325F.69(1).

406.     Gilead's conduct constitutes 1) representing that goods have characteristics or benefits they do not have in violation of Minn. Stat. §§ 325D.44(2)(5); and 2) representing that goods are of a particular standard or quality when they are another in violation of Minn. Stat. §§ 325D.44(2)(7).

407.     Gilead's conduct significantly impacted the public as actual or potential consumers of Gilead's TDF Drugs. Millions of consumers have ingested one or more of the TDF Drugs and Gilead has directed its misleading marketing and promotional messages to the market generally. Consumers like Plaintiffs are at an informational disadvantage and lack bargaining power relative to Gilead. Gilead's conduct has previously impacted other consumers and has significant potential to do so in the future.

408.     Minnesota Plaintiffs were injured by Gilead's violations of Minn. Stat. §§ 325F.68 *et seq*., §§ 325D.44 *et seq*.

409.     Minnesota Plaintiffs seek damages, costs of investigation, and reasonable attorneys' fees.

**f.      New York, N.Y. Gen. Bus. Law § 349**

410.     Gilead's conduct constitutes deceptive acts or practices in the conduct of any business, trade or commerce in violation of N.Y. Gen. Bus. Law § 349.

411.     Gilead's conduct was directed at consumers.

412.     Gilead's conduct significantly impacted the public as actual or potential consumers of Gilead's TDF Drugs. Millions of consumers have ingested one or more of the TDF Drugs and Gilead has directed its misleading marketing and promotional messages to the market generally. Consumers like Plaintiffs are at an informational disadvantage and lack bargaining power relative to Gilead.

1    Gilead's conduct has previously impacted other consumers and has significant potential to do so in

2    the future.

3        413.    New York Plaintiffs were injured by reason of Gilead's violations of N.Y. Gen. Bus.

4    Law § 349.

5        414.    New York Plaintiffs seek actual damages, three times actual damages in an amount

6    not to exceed $1,000 in light of Gilead's willful or knowing violations, and reasonable attorneys'

7    fees.

8                                **PRAYER FOR RELIEF**

9        Wherefore, Plaintiffs request that the Court enter an order or judgment against Gilead and in

10   favor of Plaintiff, and grant the following relief:

11       A.    Declare, adjudge, and decree the conduct of Gilead as alleged herein to be unlawful,

12   unfair, and/or deceptive and otherwise in violation of the law;

13       B.    Award Plaintiffs actual, compensatory, and/or statutory damages in an amount to be

14   proven at trial;

15       C.    Award Plaintiffs punitive and exemplary damages as permitted by law and the statutes

16   cited herein in an amount to be proven at trial;

17       D.    Award Plaintiffs restitution and restitutionary disgorgement to restore ill-gotten gains

18   received by Gilead as a result of the unfair, wrongful, and deceptive conduct alleged herein;

19       E.    Award Plaintiffs the costs of bringing this suit, including reasonable attorneys' fees;

20   and

21       F.    Award Plaintiffs such other and further relief as to which Plaintiffs may be entitled in

22   law or equity.

23                                **JURY DEMAND**

24       Pursuant to Federal Rule of Civil Procedure 38(c), Plaintiffs demand a trial by jury on all

25   matters so triable.

26

27

28

1   DATED: January 28, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Shana E. Scarlett*
    Shana E. Scarlett (SBN 217895)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
Email: shanas@hbsslaw.com

Steve W. Berman (*pro hac vice* to be filed)
Anne F. Johnson (*pro hac vice* to be filed)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
Email: steve@hbsslaw.com
Email: annej@hbsslaw.com

Robert C. Hilliard (*pro hac vice* to be filed)
Katrina R. Ashley (*pro hac vice* to be filed)
HILLIARD MARTINEZ GONZALES LLP
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
Tel: (361) 882-1612
Fax: (361) 882-3015
Email: bobh@hmglawfirm.com
Email: kashley@hmglawfirm.com

*Attorneys for Plaintiffs*